## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GEORGE MILLER, derivatively on behalf of AT&T INC. | |
| Plaintiff, | C.A. No. |
| vs. | |
| RANDALL L. STEPHENSON, JOHN T. STANKEY, PASCAL DESROCHES, JOHN STEPHENS, SAMUEL A. DI PIAZZA, JR., SCOTT T. FORD, GLENN H. HUTCHINS, WILLIAM E. KENNARD, DEBRA L. LEE, STEPHEN J. LUCZO, MICHAEL B. McCALLISTER, BETH E. MOONEY, MATTHEW K. ROSE, CYNTHIA B. TAYLOR, LUIS A. UBIÑAS, and GEOFFREY Y. YANG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| AT&T INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff George Miller ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant AT&T Inc. ("AT&T" or the "Company"), files this Verified Shareholder Derivative Complaint against Randall L. Stephenson ("Stephenson"), John T. Stankey ("Stankey"), Pascal Desroches ("Desroches"), John Stephens ("Stephens"), Samuel A. Di Piazza, Jr. ("Di Piazza"), Scott T. Ford ("Ford"), Glenn H. Hutchins ("Hutchins"), William E. Kennard ("Kennard"), Debra L. Lee ("Lee"), Stephen J. Luczo ("Luczo"), Michael B. McCallister

1

("McCallister"), Beth E. Mooney ("Mooney"), Matthew K. Rose ("Rose"), Cynthia B. Taylor ("Taylor"), Luis A. Ubiñas ("Ubiñas"), and Geoffrey Y. Yang ("Yang") (collectively, the "Individual Defendants," and together with AT&T, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AT&T, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AT&T, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by AT&T's directors and officers from March 1, 2020 through July 27, 2023, inclusive (the "Relevant Period").

2.     AT&T is a Delaware-incorporated multinational telecommunications holding company with principal executive offices in Dallas, Texas. AT&T represents itself to be "a leading provider of telecommunications and technology services globally." The Company provides both wireless and wireline telecom and broadband services to consumers worldwide.

3.      During the Relevant Period, the Company represented to the investing public through its website and SEC filings that the Company was in compliance with environmental, health, and safety regulations and dedicated to employee welfare and safety, as well as the welfare of the environment and communities the Company serves. In relevant part, Defendants repeatedly represented that AT&T was committed to, *inter alia*, "[s]upporting employees in meeting their environment, health and safety obligations by providing necessary and appropriate training, job aids and resources."

4.      However, on July 9, 2023, *The Wall Street Journal* ("*WSJ*") published an article entitled "America is Wrapped in Miles of Toxic Lead Cables" (the "July 9 Article") which reported that more than 2,000 lead-covered cables, including various used by the Company, were degrading and leaching into soil and groundwater, posing a significant risk to public health and the environment. The cables, originally used by the Bell Telephone Company ("Ma Bell") during the 1980s, had been used subsequently by various successor telecommunication companies including AT&T, who were aware of serious health and environmental risks associated with the lead cables, including **heart disease, anemia, and infertility**, but failed to take remedial action to protect its employees or the public from the toxic cables. The article reported that, at more than four dozen locations tested by the *WSJ*, lead levels in the sediment and soil exceeded the safety recommendations set by the U.S. Environmental Protection Agency ("EPA") (collectively, the "Lead Cable Misconduct").

5.      The following day, on July 10, 2023, the *WSJ* published a second article regarding the environmental impact of the lead cables entitled "Bayou Teche is an Epicenter of America's Lead Cable Problem" (the "July 10 Article"). The July 10 Article reported that a series of lead cables originally laid by Ma Bell and later acquired by AT&T were leaching into the soil and

groundwater of Louisiana's 125-mile-long Bayou Teche, making water in the bayou unsafe for drinking under EPA guidelines.

6.      On this news, the price per share of AT&T stock fell $0.34, or 2.178%, from closing at a price of $15.61 per share on July 7, 2023, to close at a price of $15.27 per share on July 10, 2023.

7.      Later, on July 12, 2023, the *WSJ* published an article entitled "What AT&T and Verizon Knew About Toxic Lead Cables" (the "July 12 Article"). The July 12 Article highlighted the Company's knowledge of the health risks related to the lead cables within their network, reporting that "*[f]or decades, AT&T*, Verizon and other firms dating back to the old Bell System *have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees*." (Emphasis added.)

8.      Two days later, on July 14, 2023, the *WSJ* published another article about the lead cable environmental impacts entitled "I was Really Sick, and I Didn't Know From What[.]" The article included stories from former and current AT&T employees which emphasized the dangers telecom workers faced as a result of handling objects covered in lead. Additionally, the article quoted one former AT&T employee who represented that the Company had "no formal training" on the use of lead and that Company employees "felt it was not a danger since everyone worked on it with no mask."

9.      On this news, the price per share of AT&T stock declined by $0.62, or 4.1%, from closing at a price of $15.12 per share on July 13, 2023, to close at a price of $14.50 per share on July 14, 2023.

10.     Several days later, on July 17, 2023, *investing.com* published an article entitled "Telecom stocks' cuts continue on risks tied to toxic lead cables; AT&T at 29-year lows." The article discussed how analysts had downgraded AT&T due to the revelations about the lead covered cables. The same day, the *WSJ* also published two articles which revealed, *inter alia*, that (1) three environmental groups had called on the EPA to ensure the "immediate removal" of any of the aforementioned lead cables that were accessible to children; and (2) AT&T and other telecom companies had "shed a combined $18 billion in market cap" since the *WSJ* first published the July 9 Article.

11.     On this news, the price per share of AT&T stock fell by $0.97, or 6.689%, from a closing price of $14.50 per share on July 14, 2023, to close at a price of $13.53 per share on July 17, 2023.

12.     The truth fully emerged on July 26, 2023 when the *WSJ* published an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables" (the "July 26 Article") which described how the Justice Department and EPA had begun investigating the potential risks to health and the environment from the lead cables. In particular, the July 26 Article represented that the Justice Department's civil inquiry "focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables[.]" In addition, the article revealed that the EPA had "***specifically asked [AT&T] for information relating to***, among other things, ***AT&T's lead-sheathed cables in Bayou Teche, La., cited in the Journal investigation.***" (Emphasis added.)

13.     On this news, the price per share of AT&T stock fell $0.38, or 2.55%, from a closing price of $14.89 per share on July 26, 2023, to close at a price of $14.51 per share on July 27, 2023.

14.     Throughout the Relevant Period, the Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about AT&T's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing AT&T to repurchase its own stock at artificially inflated rates. Indeed, between March 2020 and July 2023, approximately 124 million shares of AT&T common stock were repurchased, costing the Company over $3.4 billion. Since the repurchased stock was only worth $14.24 per share, which was the adjusted price at close of trading on July 27, 2023, AT&T overpaid by over $1.7 billion.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and participated and/or facilitated the Company's participation in the Lead Cable Misconduct.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to investigations by the Justice Department and the EPA, the need to remedy the Lead Cable Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Lead Cable Misconduct, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, AT&T is incorporated in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of AT&T. Plaintiff has continuously held 1,000 shares of AT&T common stock since he purchased them on April 21, 2017.

### Nominal Defendant AT&T

24.     AT&T is a Delaware corporation with principal executive offices at 208 South Akard St., Dallas, Texas, 75202. AT&T common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "T."

### Defendant Stephenson

25.     Defendant Stephenson began his career with AT&T in 1982 and served as the Company's Chief Executive Officer ("CEO") and Chairman from May 9, 2007 to June 30, 2020 and as the Executive Chairman of the Company's Board from July 1, 2020 until he retired on January 21, 2021. Prior to these roles, he served as the Company's Chief Operating Officer ("COO") from 2004 to 2007 and Chief Financial Officer ("CFO") from 2001 to 2004. According to the Schedule 14A the Company filed with the SEC on March 22, 2022 (the "2022 Proxy Statement"), as of December 31, 2021, Defendant Stephenson beneficially owned 2,763,054 shares of AT&T common stock. Given that the price per share of the Company's common stock at the close of trading on December 31, 2021 was $16.20[1], Defendant Stephenson owned approximately $44.7 million worth of AT&T stock as of that date.

26.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Stephenson received $16,345,499 in total compensation from the Company. This included $125,768 in salary, $2,967,114 in change in pension value and nonqualified deferred compensation earnings, and $13,252,617 in all other compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Stephenson received $29,154,628 in total compensation from the Company. This included $900,000 in salary, $20,999,989 in stock awards, $2,250,000 in non-equity incentive plan compensation, $3,763,883 in change in pension value and nonqualified deferred compensation earnings, and $1,240,756 in all other compensation.

27.     The Schedule 14A the Company filed with the SEC on March 11, 2020 (the "2020 Proxy Statement") stated the following about Defendant Stephenson:

> Mr. Stephenson is Chairman of the Board and Chief Executive Officer of AT&T Inc. and has served in this capacity since 2007, having also served as President from 2007 through September 2019. He has held a variety of high-level finance,

---

[1] The stock ownership calculations contained in the "Parties" section of this complaint use the adjusted closing price of the Company's stock on the given date referenced therein.

operational, and marketing positions with AT&T, including serving as Chief Operating Officer from 2004 until his appointment as Chief Executive Officer in 2007 and as Chief Financial Officer from 2001 to 2004. He began his career with the Company in 1982. Mr. Stephenson received his B.S. in accounting from Central State University (now known as the University of Central Oklahoma) and earned his Master of Accountancy degree from the University of Oklahoma.

**Defendant Stankey**

28.     Defendant Stankey has served as the Company's CEO since July 1, 2020 and has served as a Company director since 2020. Prior to this role, he served as the Company's President and COO from October 2019 through June 2020. According to the Schedule 14A the Company filed with the SEC on April 4, 2023 (the "2023 Proxy Statement"), as of December 31, 2022, Defendant Stankey beneficially owned 676,451 shares of AT&T stock. Given that the price per share of the Company's common stock at the close of trading on December 30, 2022 was $17.25, Defendant Stankey owned approximately $11.6 million worth of AT&T stock as of that date.

29.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Stankey received $22,915,526 in total compensation from the Company. This included $2,400,000 in salary, $13,499,988 in stock awards, $5,320,000 in non-equity incentive plan compensation, $1,264,319 in change in pension value and nonqualified deferred compensation earnings, and $431,219 in all other compensation. For the 2021 Fiscal Year, Defendant Stankey received $24,820,879 in total compensation from the Company. This included $2,400,000 in salary, $13,420,341 in stock awards, $6,888,000 in non-equity incentive plan compensation, $1,468,869 in change in pension value and nonqualified deferred compensation earnings, and $643,669 in all other compensation. For the 2020 Fiscal Year, Defendant Stankey received $21,020,917 in total compensation from the Company. This included $2,050,000 in salary, $13,499,999 in stock awards, $3,250,000 in non-equity incentive plan compensation, $1,411,950 in change in pension value and nonqualified deferred compensation earnings, and $808,968 in all other compensation.

30.     The 2023 Proxy Statement stated the following about Defendant Stankey:

Mr. Stankey is Chief Executive Officer and President of AT&T Inc. and has served in this capacity since July 2020. Prior to that, he served as President and Chief Operating Officer from October 2019 through June 2020. From June 2018 through April 2020, Mr. Stankey also served as CEO of Warner Media, LLC. During his tenure with the Company, Mr. Stankey has held a variety of other leadership positions, including serving as CEO-AT&T Entertainment Group (2015-2017); Chief Strategy Officer (2012-2015); President and CEO of AT&T Business Solutions (2010-2011); President and CEO of AT&T Operations, Inc. (2008-2010); Group President-Telecom Operations (2007-2008); Chief Technology Officer (2004-2006); and Chief Information Officer (2003-2004). Mr. Stankey began his career with the Company in 1985. He holds a bachelor's degree in finance from Loyola Marymount University and an M.B.A. from the University of California, Los Angeles.

**Skills and Qualifications**
Mr. Stankey has more than 35 years of experience spanning nearly every area of AT&T's business, which has provided him with intimate knowledge of our Company, values and culture. He has served in a variety of roles including CEO of WarnerMedia; CEO of AT&T Entertainment Group; Chief Strategy Officer; Chief Technology Officer; CEO of AT&T Operations; and CEO of AT&T Business Solutions.

**<u>Defendant Desroches</u>**

31.     Defendant Desroches has served as the Company's Senior Executive Vice President and Chief Financial Officer ("CFO") since April 2021. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Desroches beneficially owned 337,220 shares of AT&T stock. Given that the price per share of the Company's common stock at the close of trading on December 30, 2022 was $17.25, Defendant Desroches owned approximately $5.8 million worth of AT&T stock as of that date.

32.     For the 2022 Fiscal Year, Defendant Desroches received $11,752,507 in total compensation from the Company. This included $1,250,000 in salary, $7,499,993 in stock awards, $2,612,500 in non-equity incentive plan compensation, and $390,014 in all other compensation. For the 2021 Fiscal Year, Defendant Desroches received $11,745,133 in total compensation for

the Company. This included $1,250,000 in salary, $5,999,990 in stock awards, $3,382,500 in non-equity incentive plan compensation, and $1,112,643 in all other compensation.

33.     AT&T's website states the following about Defendant Desroches:

Pascal became AT&T's Senior Executive Vice President and Chief Financial Officer in April of 2021. In this role, he is responsible for AT&T's financial planning, accounting, tax, auditing, treasury, investor relations and corporate real estate functions.

Pascal previously served as the Executive Vice President and Chief Financial Officer of WarnerMedia and the Administrative Officer of Turner Broadcasting System Inc., with responsibility for all of WarnerMedia's financial operations as well as Turner's global communications, facilities, human resources, legal, strategy and research, security and technology organizations. Prior to his role with WarnerMedia, Pascal served as Turner's Chief Financial Officer and Senior Vice President and Global Controller of Time Warner.

Before joining the WarnerMedia family, Pascal was a partner in KPMG LLP's Department of Professional Practice and was also a professional accounting fellow with the Office of the Chief Accountant at the United States Securities and Exchange Commission (SEC).

Pascal is an honors graduate of St. John's University where he received a BS in accounting. He received an MBA, with a concentration in corporate finance and management of organization, from the Columbia University Graduate School of Business.

Previously, Pascal served on the Board of Directors of Davita Inc. (NYSE: DVA) where he Chaired the Audit Committee and was a Trustee of St. John's University. He serves on the United Way Of Metropolitan Dallas Board of Directors, the Board of Trustees of Prep for Prep, St. John's Diversity, Equity & Inclusion Committee, and is a member of the UT Southwestern President's advisory board.

Pascal and his wife, Yvette, live in Dallas and have two adult children, Erika and Justin.

**Defendant Stephens**

34.     Defendant Stephens served as the Company's Senior Executive Vice President and CFO from 2011 until his retirement on March 31, 2021. According to the 2022 Proxy Statement, as of December 31, 2021, Defendant Stephens beneficially owned 837,995 shares of AT&T stock.

Given that the price per share of the Company's common stock at the close of trading on December 31, 2021 was $16.20, Defendant Stephens owned approximately $13.5 million worth of AT&T stock as of that date.

35.     For the 2021 Fiscal Year, Defendant Stephens received $4,145,305 in total compensation from the Company. This included $318,460 in salary, $830,250 in non-equity incentive plan compensation, $831,607 in change in pension value and nonqualified deferred compensation earnings, and $2,164,988 in all other compensation. For the 2020 Fiscal Year, Defendant Stephens received $16,137,145 in total compensation from the Company. This included $1,145,833 in salary, $250,000 in bonus, $10,750,008 in stock awards, $2,025,000 in non-equity incentive plan compensation, $1,059,686 in change in pension value and nonqualified deferred compensation earnings, and $906,618 in all other compensation.

36.     The 2020 Proxy Statement stated the following about Defendant Stephens:

John Stephens has 26 years of service with the Company. Mr. Stephens was appointed to his current position, Chief Financial Officer, in 2011. He has responsibility for financial planning, corporate development, accounting, tax, auditing, treasury, investor relations, corporate real estate, shared services, and disposition of all non-strategic assets. Prior to his current position, Mr. Stephens held a series of successive positions in the finance department. Before joining the Company, Mr. Stephens held a variety of roles in public accounting.

**Defendant Di Piazza**

37.     Defendant Di Piazza served as a Company director from 2015 until he resigned in April 2022. Prior to his resignation, he served as Chairperson of the Audit Committee and as a member of the Executive Committee and the Public Policy and Corporate Reputation Committee.

38.     For the 2022 Fiscal Year, Defendant Di Piazza received $336,297 in total compensation from the Company. This included $56,667 in fees earned or paid in cash and $279,630 in all other compensation. For the 2021 Fiscal Year, Defendant Di Piazza received

$405,000 in total compensation from the Company. This included $170,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation. For the 2020 Fiscal Year, Defendant Di Piazza received $405,000 in total compensation from the Company. This included $170,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation.

39.    The 2022 Proxy Statement stated the following about Defendant Di Piazza:

Mr. Di Piazza served as Global Chief Executive Officer of PricewaterhouseCoopers International Limited (an international professional services firm) from 2002 until his retirement in 2009. Mr. Di Piazza began his 36-year career with PricewaterhouseCoopers (PwC, formerly Coopers & Lybrand) in 1973 and was named Partner in 1979 and Senior Partner in 2000. From 1979 to 2002, Mr. Di Piazza held various regional leadership positions with PwC. After his retirement from PwC, Mr. Di Piazza joined Citigroup where he served as Vice Chairman of the Global Corporate and Investment Bank from 2011 until 2014. Mr. Di Piazza serves as a member of the board of trustees of the Mayo Clinic, where he previously served as Chairman of the Board from 2010 to 2021. He received his B.S. in accounting from the University of Alabama and earned his M.S. in tax accounting from the University of Houston. He served as a director of DIRECTV from 2010 until the company was acquired by AT&T Inc. in 2015.

**Skills and Qualifications**
Mr. Di Piazza brings significant executive and business leadership through his management of a multi-cultural, complex professional services organization serving clients around the world. He has significant global accounting, cyber and financial experience, and extensive knowledge of the entertainment business, including from his prior service as a director of DIRECTV, a digital entertainment services company. He also has experience with sustainability and social responsibility as a former director on the UN Global Compact Board and former Chairman of the World Business Council for Sustainable Development.

**Defendant Ford**

40.    Defendant Ford has served as a Company director since 2012. He also serves as Chairperson of the Corporate Development and Finance Committee and as a member of the Executive Committee and the Human Resources Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Ford beneficially owned 81,319 shares of AT&T common stock. Given that the price per share of the Company's common stock at the close of

trading on December 30, 2022 was $17.25, Defendant Ford owned approximately $1.4 million worth of AT&T stock as of that date.

41.     For the 2022 Fiscal Year, Defendant Ford received $390,583 in total compensation from the Company. This included $160,000 in fees earned or paid in cash, $220,000 in stock awards, and $10,583 in all other compensation. For the 2021 Fiscal Year, Defendant Ford received $380,000 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2020 Fiscal Year, Defendant Ford received $380,000 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $220,000 in stock awards.

42.     The 2023 Proxy Statement stated the following about Defendant Ford:

Mr. Ford currently serves as a director and Chief Executive Officer of Westrock Coffee Company (a fully integrated manufacturer of coffee, tea and coffee-related products), which he co-founded in 2009 and where he has served as Chief Executive Officer since 2009. Mr. Ford also founded Westrock Group, LLC (a private investment firm in Little Rock, Arkansas) in 2013, where he has served as Member and Chief Executive Officer since its inception. Westrock Group operates Westrock Asset Management, LLC (a global alternative investment firm), which Mr. Ford founded in 2014 and where he has served as Chief Executive Officer and Chief Investment Officer since 2014. Mr. Ford previously served as President and Chief Executive Officer of Alltel Corporation (a provider of wireless voice and data communications services) from 2002 to 2009 and served as an executive member of Alltel Corporation's board of directors from 1996 to 2009. He also served as Alltel Corporation's President and Chief Operating Officer from 1998 to 2002. Mr. Ford led Alltel through several major business transformations, culminating with the sale of the company to Verizon Wireless in 2009. Mr. Ford received his B.S. in finance from the University of Arkansas, Fayetteville.

**Skills and Qualifications**
Mr. Ford brings extensive experience in the telecommunications industry through his leadership of a large, publicly traded wireless and wireline communications company. He has experience managing complex business operations in various regulatory environments internationally and has led several major business transformations, including the spin-off of Windstream and Alltel.

<u>**Defendant Hutchins**</u>

43.     Defendant Hutchins has served as a Company director since 2014. He also serves as Chairperson of the Governance and Policy Committee and as a member of the Corporate Development and Finance Committee and the Executive Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Hutchins beneficially owned 167,651 shares of AT&T common stock. Given that the price per share of the Company's common stock at the close of trading on December 30, 2022 was $17.25, Defendant Hutchins owned approximately $2.8 million worth of AT&T stock as of that date.

44.     For the 2022 Fiscal Year, Defendant Hutchins received $396,885 in total compensation from the Company. This included $158,750 in fees earned or paid in cash, $220,000 in stock awards, and $18,135 in all other compensation. For the 2021 Fiscal Year, Defendant Hutchins received $375,000 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2020 Fiscal Year Defendant Hutchins received $405,974 in total compensation from the Company. This included $151,250 in fees earned or paid in cash, $220,000 in stock awards, and $34,724 in all other compensation.

45.     The 2023 Proxy Statement stated the following about Defendant Hutchins:

Mr. Hutchins is Chairman of North Island Management, LLC (a family investment office, aka Tide Mill, LLC, based in New York, New York) and has served in this capacity since 2013. Since 2020, Mr. Hutchins has also been Chairman of North Island Ventures (an investment firm in New York, New York). He has been co-owner of Ordinal Ventures, LLC and Ordinal Holdings ManageCo, LP (investment advisory firms in New York, New York) since 2017. Mr. Hutchins is a member of the Investment Board and the International Advisory Board of GIC Private Limited, the sovereign wealth fund of Singapore, which he joined in 2020. He is a co-founder of Silver Lake (a technology investment firm based in New York, New York and Menlo Park, California), which was founded in 1999 and where Mr. Hutchins served as co-CEO until 2011 and as Managing Director from 1999 until 2011. Prior to that, Mr. Hutchins was Senior Managing Director at The Blackstone Group (a global investment firm) from 1994 to 1999. Mr. Hutchins served as Chairman of the Board of SunGard Data Systems Inc. (a software and technology services company) from 2005 until 2015, and a director of Nasdaq, Inc. and Virtu Financial (2017-2021). Previously, Mr. Hutchins served as a Special

Advisor in the White House on economic and health-care policy from 1993 to 1994 and as Senior Advisor on the transition of the Administration from 1992 to 1993. He is co-Chairman of the Brookings Institution. Mr. Hutchins served as a director of the Federal Reserve Bank of New York from 2011 until 2020. He holds an A.B. from Harvard College, an M.B.A. from Harvard Business School, and a J.D. from Harvard Law School.

**Skills and Qualifications**

Mr. Hutchins brings extensive experience in areas that intersect technology, innovation and investment, along with financial, public policy and strategic planning experience. As the co-founder and co-CEO of a global investment firm, he brings significant leadership, business planning and human capital management expertise.

**Defendant Kennard**

46.    Defendant Kennard has served as a Company director since 2014 and as the Chairman of the Board since January 2021. He also serves as Chairperson of the Executive Committee and as a member of the Governance and Policy Committee.

47.    For the 2022 Fiscal Year, Defendant Kennard received $688,161 in total compensation from the Company. This included $440,000 in fees earned or paid in cash, $220,000 in stock awards, and $28,161 in all other compensation. For the 2021 Fiscal Year, Defendant Kennard received $675,000 in total compensation from the Company. This included $440,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation. For the 2020 Fiscal Year, Defendant Kennard received $375,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation.

48.    The 2023 Proxy Statement stated the following about Defendant Kennard:

Mr. Kennard is Chairman of the Board of Directors of AT&T Inc. and has served in this capacity since January 2021. Mr. Kennard served as the United States Ambassador to the European Union from 2009 to 2013. From 2001 to 2009, Mr. Kennard was Managing Director of The Carlyle Group (a global asset management firm) where he led investments in the telecommunications and media sectors. Mr. Kennard served as Chairman of the U.S. Federal Communications

Commission from 1997 to 2001. Before his appointment as FCC Chairman, he served as the FCC's General Counsel from 1993 until 1997. Mr. Kennard joined the FCC from the law firm of Verner, Liipfert, Bernhard, McPherson and Hand (now DLA Piper) where he was a partner and member of the firm's board of directors. Mr. Kennard is a co-founder of Astra Capital Management (a private equity firm) and has served on the board of trustees of Yale University since 2014. Mr. Kennard received his B.A. in communications from Stanford University and earned his law degree from Yale Law School.

**Skills and Qualifications**

Mr. Kennard brings expertise in the global telecommunications industry including knowledge of the complex regulatory and policy landscape for communications, consumer perspective, and an understanding of the technological and strategic shifts in the industries. He also has experience in international trade and global investment.

### **Defendant Lee**

49.     Defendant Lee served as a Company director from 2019 until she resigned in April 2022. Prior to her resignation, she served as a member of the Corporate Governance and Nominating Committee and the Public Policy and Corporate Reputation Committee.

50.     For the 2022 Fiscal Year, Defendant Lee received $340,551 in total compensation from the Company. This included $46,667 in fees earned or paid in cash and $293,884 in all other compensation. For the 2021 Fiscal Year, Defendant Lee received $360,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2020 Fiscal Year, Defendant Lee received $375,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation.

51.     The 2022 Proxy Statement stated the following about Defendant Lee:

Ms. Lee is Chair of Leading Women Defined Foundation (a nonprofit education and advocacy organization in Los Angeles, California), which she founded in 2009. She has served in this capacity since June 2018. Ms. Lee also co-founded The Monarchs Collective (a management consulting firm in Los Angeles, California), where she has served as a partner since 2020. Ms. Lee served as Chairman and Chief Executive Officer of BET Networks (a global media and entertainment

subsidiary of Viacom, Inc., headquartered in New York, New York) from 2006 until her retirement in 2018. Ms. Lee joined BET Networks in 1986 and served in several leadership roles, including President and Chief Executive Officer (2005-2006), President and Chief Operating Officer (1995-2005), and Executive Vice President and General Counsel (1986-1995). Ms. Lee holds a B.A. in political science from Brown University, a master's in public policy from Harvard University John F. Kennedy School of Government, and a J.D. from Harvard Law School.

**Skills and Qualifications**
Ms. Lee has extensive leadership in the media and entertainment industry. She brings strong operational and transformational experience through the development and execution of innovative strategic plans.

**Defendant Luczo**

52.     Defendant Luczo has served as a Company director since 2019. He also serves as a member of the Audit Committee and the Corporate Development and Finance Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Luczo beneficially owned 500,000 shares of AT&T stock. Given that the price per share of the Company's stock at the close of trading on December 30, 2022 was $17.25, Defendant Luczo owned approximately $8.6 million worth of AT&T stock as of that date.

53.     For the 2022 Fiscal Year, Defendant Luczo received $360,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2021 Fiscal Year, Defendant Luczo received $360,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2020 Fiscal Year, Defendant Luczo received $360,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards.

54.     The 2023 Proxy Statement stated the following about Defendant Luczo:

Mr. Luczo is a Managing Partner of Crosspoint Capital Partners, L.P. (a private equity investment firm focused on the cybersecurity and privacy sectors located in

Menlo Park, California) and has served in this capacity since February 2020. Mr. Luczo served as Chairman of the Board of Seagate Technology plc (a global provider of data storage technology and solutions in Fremont, California) from 2002 until July 2020 and as a member of Seagate's board of directors until October 2021. Mr. Luczo joined Seagate's predecessor company in 1993 as Senior Vice President of Corporate Development, joined its board of directors in 1998, and served as its Chief Executive Officer from 1998 to 2004 and from 2009 to 2017. Prior to joining Seagate, Mr. Luczo held various roles in investment banking. He holds an A.B. in economics from Stanford University and earned an M.B.A. from Stanford Graduate School of Business.

**Skills and Qualifications**

Mr. Luczo brings deep experience in technology, business development, strategic planning, and operations through his leadership at Seagate. He has significant experience in financial matters and executing strategic cost initiatives and transactions.

**Defendant McCallister**

55.     Defendant McCallister has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Human Resources Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant McCallister beneficially owned 59,594 shares of AT&T stock. Given that the price per share of the Company's stock at the close of trading on December 30, 2022 was $17.25, Defendant McCallister owned approximately $1 million worth of AT&T stock as of that date.

56.     For the 2022 Fiscal Year, Defendant McCallister received $378,486 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and $18,486 in all other compensation. For the 2021 Fiscal Year, Defendant McCallister received $372,894 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and $12,894 in all other compensation. For the 2020 Fiscal Year, Defendant McCallister received $375,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation.

57.     The 2023 Proxy Statement stated the following about Defendant McCallister:

Mr. McCallister served as Chairman of Humana Inc. (a health care company in Louisville, Kentucky) from 2010 to 2013 and as a member of Humana's board of directors beginning in 2000. He also served as Humana's Chief Executive Officer from 2000 until his retirement in 2012. During Mr. McCallister's tenure, he led Humana through significant expansion and growth, nearly quadrupling its annual revenues between 2000 and 2012, and led the company to become a FORTUNE 100 company. Mr. McCallister received his B.S. in accounting from Louisiana Tech University and earned his M.B.A. from Pepperdine University.

**Skills and Qualifications**
Mr. McCallister has extensive leadership experience in the oversight of a large, publicly traded company with a focus on strategic planning and organic growth in the evolving health care sector. He also has deep experience in the development of customer-focused solutions.

**<u>Defendant Mooney</u>**

58.     Defendant Mooney has served as a Company director since 2013. She also serves as Chairperson of the Human Resources Committee and as a member of the Executive Committee and the Governance and Policy Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Mooney beneficially owned 28,700 shares of AT&T stock. Given that the price per share of the Company's stock at the close of trading on December 30, 2022 was $17.25, Defendant Mooney owned approximately $495,075 worth of AT&T stock as of that date.

59.     For the 2022 Fiscal Year, Defendant Mooney received $415,000 in total compensation from the Company. This included $165,000 in fees earned or paid in cash, $220,000 in stock awards, and $30,000 in all other compensation. For the 2021 Fiscal Year, Defendant Mooney received $396,495 in total compensation from the Company. This included $165,000 in fees earned or paid in cash, $220,000 in stock awards, and $11,495 in all other compensation. For the 2020 Fiscal Year, Defendant Mooney received $400,000 in total compensation from the Company. This included $165,000 in fees earned or paid in cash, $220,000 in stock awards, and $15,000 in all other compensation.

60.     The 2023 Proxy Statement stated the following about Defendant Mooney:

Ms. Mooney served as Chairman and Chief Executive Officer of KeyCorp (a bank holding company in Cleveland, Ohio) from 2011 until her retirement in May 2020. She previously served as KeyCorp's President and Chief Operating Officer from 2010 to 2011. Ms. Mooney joined KeyCorp in 2006 as a Vice Chair and head of Key Community Bank. Prior to joining KeyCorp, beginning in 2000 she served as Senior Executive Vice President at AmSouth Bancorporation (now Regions Financial Corporation), where she also became Chief Financial Officer in 2004. Ms. Mooney served as a director of the Federal Reserve Bank of Cleveland in 2016 and served three one-year terms representing the Fourth Federal Reserve District on the Federal Advisory Council from 2017 to 2019. She received her B.A. in history from the University of Texas at Austin and earned her M.B.A. from Southern Methodist University.

**Skills and Qualifications**
Ms. Mooney brings executive leadership skills through the management of a large, publicly traded and highly-regulated company, knowledge of business strategy, and more than 30 years of experience in the customer-focused financial services industry.

**<u>Defendant Rose</u>**

61.     Defendant Rose has served as a Company director since 2010. He also serves as a member of the Corporate Development and Finance Committee and the Human Resources Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Rose beneficially owned 208,050 shares of AT&T stock. Given that the price per share of the Company's stock at the close of trading on December 30, 2022 was $17.25, Defendant Rose owned approximately $3.5 million worth of AT&T stock as of that date.

62.     For the 2022 Fiscal Year, Defendant Rose received $401,809 in total compensation from the Company. This included $146,667 in fees earned or paid in cash, $220,000 in stock awards, and $35,142 in all other compensation. For the 2021 Fiscal Year, Defendant Rose received $427,099 in total compensation from the Company. This included $165,000 in fees earned or paid in cash, $220,000 in stock awards, and $42,099 in all other compensation. For the 2020 Fiscal Year, Defendant Rose received approximately $451,732 in total compensation from the Company.

This included $220,000 in fees earned or paid in cash, $220,000 in stock awards, and $11,732 in all other compensation.

63.     The 2023 Proxy Statement stated the following about Defendant Rose:

Mr. Rose served as Chairman of the Board and Chief Executive Officer of Burlington Northern Santa Fe, LLC (a freight rail system based in Fort Worth, Texas and a subsidiary of Berkshire Hathaway Inc., formerly known as Burlington Northern Santa Fe Corporation) from 2002 until his retirement in April 2019, having also served as BNSF's President until 2010. Mr. Rose began his 26-year career with BNSF (then Burlington Northern Railroad Company) in 1993. During his tenure as CEO, Mr. Rose helped guide the acquisition of BNSF by Berkshire Hathaway in 2009. Before serving as Chairman, Mr. Rose held several leadership positions there and at its predecessors, including President and Chief Executive Officer from 2000 to 2002, President and Chief Operating Officer from 1999 to 2000, and Senior Vice President and Chief Operations Officer from 1997 to 1999. Mr. Rose also served as Executive Chairman of BNSF Railway Company (a subsidiary of Burlington Northern Santa Fe, LLC) until his retirement in 2019, having served as Chairman and Chief Executive Officer from 2002 to 2013. He earned his B.S. in marketing from the University of Missouri.

**Skills and Qualifications**
Mr. Rose has extensive experience in the executive oversight of a large, complex and highly-regulated organization with considerable knowledge of operations management and logistics. He brings experience overseeing long-term strategic planning and a unionized workforce.

**Defendant Taylor**

64.     Defendant Taylor has served as a Company director since 2013. She also serves as Chairperson of the Audit Committee and as a member of the Executive Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Taylor beneficially owned 5,718 shares of AT&T stock. Given that the price per share of the Company's stock at the close of trading on December 30, 2022 was $17.25, Defendant Taylor owned approximately $98,636 worth of AT&T stock as of that date.

65.     For the 2022 Fiscal Year, Defendant Taylor received $415,944 in total compensation from the Company. This included $162,500 in fees earned or paid in cash, $220,000

in stock awards, and $33,444 in all other compensation. For the 2021 Fiscal Year, Defendant

Taylor received $365,000 in total compensation from the Company. This included $140,000 in

fees earned or paid in cash, $220,000 in stock awards, and $5,000 in all other compensation. For

the 2020 Fiscal Year, Defendant Taylor received $365,000 in total compensation from the

Company. This included $140,000 in fees earned or paid in cash, $220,000 in stock awards, and

$5,000 in all other compensation.

66.     The 2023 Proxy Statement stated the following about Defendant Taylor:

Ms. Taylor is President, Chief Executive Officer and a director of Oil States
International, Inc. (a globally diversified manufacturing and energy services
provider based in Houston, Texas) and has served in this capacity since 2007. She
previously served as Oil States International, Inc.'s President and Chief Operating
Officer from 2006 to 2007 and as its Senior Vice President-Chief Financial Officer
from 2000 to 2006. Ms. Taylor was Chief Financial Officer of L.E. Simmons &
Associates, Inc. from 1999 to 2000 and Vice President-Controller of Cliffs Drilling
Company from 1992 to 1999, and prior to that, held various management positions
with Ernst & Young LLP, a public accounting firm. She has been a director of the
Federal Reserve Bank of Dallas since January 2020 and previously served as a
director of the Federal Reserve Bank's Houston Branch from 2018 to 2019. She
received her B.B.A. in accounting from Texas A&M University and is a Certified
Public Accountant.

**Skills and Qualifications**
Ms. Taylor brings executive leadership skills in the oversight of a large, publicly
traded company, vast experience in finance and public accounting, and her
experience in international business and affairs.

**Defendant Ubiñas**

67.     Defendant Ubiñas has served as a Company director since 2021. He also serves as

a member of the Audit Committee and the Governance and Policy Committee.

68.     For the 2022 Fiscal Year, Defendant Ubiñas received $375,000 in total

compensation from the Company. This included $140,000 in fees earned or paid in cash, $220,000

in stock awards, and $15,000 in all other compensation. For the 2021 Fiscal Year, Defendant

Ubiñas received $336,995 in total compensation from the Company. This included $81,667 in fees earned or paid in cash, $186,247 in stock awards, and $69,081 in all other compensation.

69.     The 2023 Proxy Statement stated the following about Defendant Ubiñas:

Mr. Ubiñas is Chairman of the Statue of Liberty - Ellis Island Foundation (a nonprofit organization that works to preserve the Statue of Liberty and Ellis Island) and has served in this capacity since January 2021; he previously served as Vice Chair from 2018 until 2021 and has served as a member of its board of directors since 2014. Mr. Ubiñas served as President of the Ford Foundation (an independent, global nonprofit grant-making organization based in New York, New York) from 2008 to 2013. From 2000 to 2007, he was Senior Partner with McKinsey & Company (a global management consulting firm based in New York, New York), where he led the firm's west coast media practice working with companies in the technology, telecommunications, and media sectors. Mr. Ubiñas joined McKinsey & Company in 1989, holding various leadership positions prior to being named Senior Partner. From 2013 to 2017, he served on the Advisory Committee on U.S. Competitiveness of the Export-Import Bank, and from 2010 to 2014, he served on the Advisory Committee for Trade Policy and Negotiations. He holds an A.B. in government from Harvard College and an M.B.A. from Harvard Business School.

**Skills and Qualifications**
Mr. Ubiñas has extensive leadership experience and expertise across the broadband and wireless industries, government, and the nonprofit sector, all of which align with AT&T's priorities to serve customers, investors, and our communities.

## **Defendant Yang**

70.     Defendant Yang served as a Company director from 2016 until he resigned in April 2022. Prior to his resignation, he served as a member of the Corporate Development and Finance Committee and the Human Resources Committee.

71.     For the 2022 Fiscal Year, Defendant Yang received $311,631 in total compensation from the Company. This included $46,667 in fees earned or paid in cash and $264,964 in all other compensation. For the 2021 Fiscal Year, Defendant Yang received $371,410 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards. For the 2020 Fiscal Year, Defendant Yang received $360,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $220,000 in stock awards.

72.    The 2022 Proxy Statement stated the following about Defendant Yang:

Mr. Yang is a founding partner and Managing Director of Redpoint Ventures (a global private equity and venture capital firm based in Woodside, California) and has served in this capacity since 1999. He also founded Performance Health Sciences (d/b/a Apeiron Life), located in Menlo Park, California, where he has served as Chief Executive Officer and a member of its board of directors since April 2018. Prior to founding Redpoint, Mr. Yang was a General Partner with Institutional Venture Partners (a private equity investment firm in Menlo Park, California), which he joined in 1987. Mr. Yang has over 35 years of experience in the venture capital industry and has helped found or served on the boards of a variety of consumer media, internet, and infrastructure companies. He holds a B.S.E. in engineering from Princeton University and an M.B.A. from Stanford University.

**Skills and Qualifications**
Mr. Yang has extensive experience in technology and innovative forms of digital media and advertising. He has helped to found, invest in, and provide strategic guidance to communications infrastructure and consumer media and entertainment companies internationally.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

73.    By reason of their positions as officers, directors, and/or fiduciaries of AT&T and because of their ability to control the business and corporate affairs of AT&T, the Individual Defendants owed AT&T and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AT&T in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AT&T and its shareholders so a`s to benefit all shareholders equally.

74.    Each director and officer of the Company owes to AT&T and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

26

75.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AT&T, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

76.     To discharge their duties, the officers and directors of AT&T were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AT&T, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AT&T's Board at all relevant times.

78.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

27

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

79.     To discharge their duties, the officers and directors of AT&T were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AT&T were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to AT&T's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AT&T conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AT&T and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AT&T's operations would comply with all applicable laws and AT&T's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

80.     Each of the Individual Defendants further owed to AT&T and the shareholders the duty of loyalty requiring that each favor AT&T's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AT&T and were at all times acting within the course and scope of such agency.

82.     Because of their advisory, executive, managerial, directorial, and controlling positions with AT&T, each of the Individual Defendants had access to adverse, non-public information about the Company.

83.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AT&T.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

85.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

86.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AT&T was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AT&T and was at all times acting within the course and scope of such agency.

## AT&T'S CODE OF ETHICS

89.     According to the Code of Ethics, the Company's Board adopted the Code of Ethics to:

• encourage honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest;

• encourage full, fair, accurate, timely and understandable disclosure;

• encourage compliance with applicable laws and governmental rules and regulations;

• ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and

• deter wrongdoing.

90.     Furthermore, the Code of Ethics provides, as to who must adhere to the Code:

All directors, officers and employees of the Company are expected to be familiar with the Code and to adhere to those principles and procedures set forth in the Code. The Company's more detailed policies and procedures set forth in AT&T's Code of Business Conduct or other corporate codes or policies are separate requirements and are not part of this Code.

91.     In a section titled "Honest and Ethical Conduct," the Code of Ethics states the

following:

> Each director, officer and employee owes a duty to the Company to act with
> integrity. Integrity requires, among other things, being honest and ethical. This
> includes the ethical handling of actual or apparent conflicts of interest between
> personal and professional relationships. Deceit and subordination of principle are
> inconsistent with integrity.
>
> Each director, officer and employee must:
>
> • Act with integrity, including being honest and ethical while still maintaining the
> confidentiality of information where required or consistent with the Company's
> policies.
>
> • Observe both the form and spirit of laws and governmental rules and regulations
> and accounting standards.
>
> • Adhere to a high standard of business ethics.
>
> • Accept no improper or undisclosed material personal benefits from third parties
> as a result of any transaction or transactions of the Company.

92.     In a section titled "Disclosure," the Code of Ethics states the following:

> Each director, officer or employee, to the extent involved in the Company's
> disclosure process, including the Chief Executive Officer, the Chief Financial
> Officer, and the Controller (the "Senior Financial Officers"), is required to be
> familiar with the Company's disclosure controls and procedures applicable to him
> or her so that the Company's public reports and documents filed with the Securities
> and Exchange Commission (the "SEC") comply in all material respects with the
> applicable federal securities laws and SEC rules. In addition, each such person
> having direct or supervisory authority regarding these SEC filings or the Company's
> other public communications concerning its general business, results, financial
> condition and prospects should, to the extent appropriate within his or her area of
> responsibility, consult with other Company officers and employees and take other
> appropriate steps regarding these disclosures with the goal of making full, fair,
> accurate, timely and understandable disclosure.
>
> Each director, officer or employee, to the extent involved in the Company's
> disclosure process, including without limitation the Senior Financial Officers,
> must:
>
> • Familiarize himself or herself with the disclosure requirements applicable to the
> Company as well as the business and financial operations of the Company.

• Not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

93.     In a section titled "Compliance," the Code of Ethics states the following, in relevant

part:

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, including those relating to accounting and auditing matters and insider trading.

Generally, it is against Company policy for any individual to profit from undisclosed information relating to the Company or any other company in violation of insider trading or other laws. Anyone who is aware of material nonpublic information relating to the Company, our customers, or other companies may not use the information to purchase or sell securities in violation of the federal securities laws.

If you are uncertain about the legal rules involving your purchase or sale of any Company securities or any securities in companies that you are familiar with by virtue of your work for the Company, you should consult with the Company's Legal Department before making any such purchase or sale.

Other policies issued by the Company also provide guidance as to certain of the laws, rules and regulations that apply to the Company's activities.

94.     In a section titled "Reporting and Accountability," the Code of Ethics states the

following:

The Audit Committee has the authority to interpret this Code in any particular situation. Any director, officer or employee who becomes aware of any violation of this Code is required to notify the Code of Ethics Contact promptly.

Any questions relating to how these policies should be interpreted or applied should be addressed to the Legal Department or the Code of Ethics Contact. Any material transaction or relationship that could reasonably be expected to give rise to a conflict of interest, as discussed in Section II of this Code, should be discussed with the Legal Department or the Code of Ethics Contact. With respect to the conduct of employees (other than the Chief Executive Officer or the Chief Financial Officer), the Code of Ethics Contact through the AT&T Hotline found on AT&T's

website at www.att.com, which shall be under the authority of the Chief Financial Officer, and with respect to the conduct of directors, the Chief Executive Officer and the Chief Financial Officer, the Code of Ethics Contact is the General Counsel. A director, officer or employee who is unsure of whether a situation violates this Code should discuss the situation with the Legal Department or the Code of Ethics Contact to prevent possible misunderstandings and embarrassment at a later date.

Each director, officer or employee must:

• Notify the appropriate Code of Ethics Contact promptly of any existing or potential violation of this Code.

• Not retaliate against any other director, officer or employee for reports of potential violations.

The Company will follow the following procedures in investigating and enforcing this Code and in reporting on the Code:

• The General Counsel or the Chief Financial Officer, as the case may be, will take all appropriate action to investigate any violations reported. In addition, the Chief Financial Officer or the General Counsel, as appropriate, shall report each violation and alleged violation involving a director or an executive officer to the Chairperson of the Audit Committee. To the extent he or she deems appropriate, the Chairperson of the Audit Committee shall participate in any investigation of a director or executive officer. After the conclusion of an investigation of a director or executive officer, the conclusions shall be reported to the Audit Committee.

• The Audit Committee will conduct such additional investigation as it deems necessary. If the Audit Committee determines that a director or executive officer has violated this Code, it will report its determination to the Board of Directors. Upon being notified that a violation has occurred, the Board of Directors or the Chief Financial Officer, as the case may be, will take such disciplinary or preventive action as deemed appropriate, up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities.

From time to time, the Company may waive provisions of this Code. Any employee or director who believes that a waiver may be called for should discuss the matter with the Legal Department or the Code of Ethics Contact. Any waiver of the Code for executive officers (including Senior Financial Officers) or directors of the Company may be made only by the Board of Directors or the Audit Committee of the Board and must be promptly disclosed.

95.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' schemes to engage in the Lead Cable Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**AUDIT COMMITTEE CHARTER**

96.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following, in relevant part:

> The Audit Committee (the "Committee") is appointed by the Board of Directors of AT&T Inc. to assist the Board in its oversight of: (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditors, (4) compliance by the Company with legal and regulatory requirements; and (5) enterprise risk management, including privacy and data security. References in this Charter to "AT&T" or the "Company" shall be to AT&T Inc. and its consolidated subsidiaries unless the context requires otherwise.
>
> The Committee shall prepare the report required by the rules of the Securities and Exchange Commission (the "Commission") to be included in the Company's proxy statement for the Annual Meeting of Stockholders.

97.     Under a section titled "Committee Authority and Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The Committee shall have the authority, to the extent it deems necessary or appropriate, to conduct investigations and to retain independent legal, accounting or other advisors. The Committee may authorize and direct the payment of compensation by the Company to the independent auditor for the purpose of preparing or issuing an audit report or for other services and to any advisors employed by the Committee as well as the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

35

The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Corporate Governance and Nominating Committee. The Committee shall annually evaluate the Committee's own performance and share such evaluation with the Corporate Governance and Nominating Committee.

98.     Under a section titled "Financial Statement and Disclosure Matters," the Audit

Committee Charter states that the Audit Committee is responsible for the following:

7. The Committee shall review and discuss with management and the independent auditor, prior to filing the Company's Form 10-K with the Commission, the annual audited financial statements, including the specific disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

8. The Committee shall review and discuss with management and the independent auditor, prior to filing the Company's Form 10-Q with the Commission, the quarterly financial statements, including disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the quarterly financial statements.

9. The Committee shall periodically review and discuss with management and the independent auditor: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

10. The Committee shall review and discuss with management and the independent auditor reports from the independent auditor on:

    a. All critical accounting policies and practices to be used;
    b. All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

c. Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

11. The Committee shall review and discuss with management the Company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

12. The Committee shall annually discuss with the independent auditor the matters required to be discussed by Auditing Standard No. 16, Communications with Audit Committees, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management. The discussion shall address, to the extent applicable, any accounting adjustments that were noted or proposed by the independent auditor but were "passed" (as immaterial or otherwise), any communications between the audit team and the auditor's national office with respect to auditing or accounting issues presented by the engagement and any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor.

13. The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Forms 10-Q about significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting. The Committee shall review with management, the senior internal auditing executive, and the independent auditor, as appropriate, attestations and reports by the independent auditor on internal control over financial reporting.

99.    Under a section titled "Compliance Oversight Responsibilities," the Audit

Committee Charter states that the Audit Committee is tasked with, *inter alia*:

19. The Committee shall obtain from the independent auditor assurance that Section 10A(b) of the Exchange Act (relating to reports by the independent auditor made to the Company of illegal acts discovered by the independent auditor) has not been implicated.

20. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous

submission by employees or other interested persons, of concerns regarding questionable accounting or auditing matters.

21. The Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports made known to AT&T's executive officers that raise material issues regarding the Company's financial statements or accounting policies.

22. The Committee shall discuss with the Company's General Counsel any significant legal, compliance or regulatory matters that may have a material impact on the financial statements or the Company's compliance policies.

23. The Committee shall meet periodically, but no less than annually, with the Company's Chief Compliance Officer ("CCO") regarding the CCO's assessment of the Company's compliance and ethics risks, the effectiveness of the Company's Corporate Compliance Program, and any other compliance related matters that either the Committee or the CCO deems appropriate. The Committee shall provide the CCO with access to communicate personally and directly with the members of the Audit Committee at any time on any matter of compliance and ethics. The Committee shall oversee the administration and enforcement of the Company's Code of Business Conduct, Code of Ethics and Corporate Compliance Program.

100.    In violation of the Audit Committee Charter, Defendants Luczo, McCallister, Taylor, and Ubiñas failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions, including as each related to the Lead Cable Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

101.    AT&T is a Delaware-incorporated multinational telecommunications holding company with principal executive offices in Dallas, Texas. AT&T represents itself to be "a leading provider of telecommunications and technology services globally." The Company provides both wireless and wireline telecom and broadband services to consumers worldwide.

## The Lead Cable Misconduct

102.    During the Relevant Period, the Company represented to the investing public through its website and SEC filings that the Company was in compliance with environmental, health, and safety regulations and dedicated to employee welfare and safety, as well as the welfare of the environment and communities the Company serves.

103.    However, on July 9, 2023, the *WSJ* published the July 9 Article, entitled "America is Wrapped in Miles of Toxic Lead Cables," which reported that more than 2,000 lead-covered cables, including various used by the Company, were degrading and leaching into soil and groundwater, posing a significant risk to public health and the environment. The cables, originally used by Ma Bell during the 1980s, had been used subsequently by various successor telecommunication companies including AT&T. The article reported that, at more than four dozen locations tested by the *WSJ*, lead levels in the sediment and soil exceeded the safety recommendations set by the EPA.

104.    The July 9 Article described the Lead Cable Misconduct, stating that "AT&T [] ha[s] left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles ahead" and further noting that "[a]s the lead degrades, it is ending up in places where Americans live, work and play." In addition, the July 9 Article represented that the lead cables had not been addressed by the telecom companies or environmental regulators.

### *Health Risks Associated with Lead Exposure*

105.    The July 9 Article explained the various different health risks associated with exposure to lead, noting that doctors say that "no amount of contact with lead is safe, whether ingested or inhaled, ***particularly for children's physical and mental development.***" (Emphasis added.) The article continued that "[e]ven without further exposure, lead can stay in the blood for

about two or three months, and be stored in bones and organs longer." Moreover, the article represented that risks associated with lead exposure included "**behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults**[.]" (Emphasis added.)

106.    In the July 9 Article, the *WSJ* reported that large numbers of American children continue to show levels of lead in their blood, which could likely be explained by "[a] new, uncontrolled source of lead like old telephone cables[.]"

107.    In the article the *WSJ* published on July 14, 2023, several former and current Company employees were interviewed regarding health issues they had experienced as a result of being exposed to lead during their time working at AT&T. The article quoted Cynthia Martinez, a current AT&T cable splicer, as saying "[l]ead was taught to me out in the field. There was no formal training, and we felt it was not a danger since everyone worked on it with no mask." The article then stated that, "Martinez filed a workers' compensation case against AT&T last year, arguing that her work caused medical troubles including kidney cancer. AT&T denied her claim, citing a lack of supporting medical information, according to a document it sent her."

108.    Another former AT&T employee interviewed for the article stated that "**she couldn't get pregnant and had anemia, severe anxiety and brain fog, plus kidney-related ailments**" all the time, all of which conditions and ailments "have been associated with lead exposure." (Emphasis added.)

### *Environmental Risks Associated with Lead Exposure*

109.    The July 12 Article reported that a senior AT&T manager noted the environmental impact of lead exposure in a 2010 Company presentation, stating that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables. Later, in 2013, that same

employee noted in another Company presentation that AT&T workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls, according to the July 12 Article. Still, the Company failed to implement these suggestions or inform its employees about the health and environmental risks associated with lead exposure.

110.    In addition, the July 9 Article reported that, during the *WSJ*'s investigation, lead was found not just near the cables but was also moving away from the cables and toward the beach, thereby tainting communities' drinking water.

### *AT&T Knew About the Health and Environmental Risks Associated with the Lead Cables But Failed to Inform Employees or the Public*

111.    The July 9 Article revealed that telecom companies including AT&T had known about "the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees." Moreover, the article reported that AT&T was aware that lead was potentially leaching into the environment but had not meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables. Indeed, according to the July 9 Article, during a 2010 presentation about employee safety, the Company admitted that "[u]nderground cable presents real possibilities for overexposure" to lead for workers removing the lead cables and further noted that "[s]ome older metropolitan areas may still have over 50% lead cable[.]"

112.    Various former Company employees interviewed by the *WSJ* admitted that it was the Company's "standard operating procedure" to abandon the lead cables in place. Indeed, the July 12 Article represented that one senior AT&T manager had stated at a gathering of telecom officials more than a decade ago that the lead covered cables "posed risks for phone-company

workers and the surrounding environment." In addition, the July 12 Article revealed that AT&T

"***knew their employees working with lead regularly had high amounts of the metal in their blood,***

***studies from the 1970s and '80s show***." (Emphasis added.) Further, the July 12 Article stated the

following regarding a smelting unit AT&T operated in the 1980s:

> Environmental records show lead contamination in the soil next to the site. An inspection document from 1985 said ***workers there were exposed to airborne lead nearly 17 times OSHA's safety standard***. And a handwritten table by an AT&T official showed that ***among 90 workers tested that year, the average blood lead level was 33.7 micrograms per deciliter, more than twice average levels back then and nearly 10 times what's considered high today.***
>
> ***Under U.S. Environmental Protection Agency and state scrutiny, AT&T agreed to help clean up the site***, including properly containing waste and environmental monitoring.

(Emphasis added.)

113.   However, the article stated that "[t]he cleanup has been delayed repeatedly."

Moreover, the July 12 Article reported that over the years, Company officials themselves had

"expressed concern about possible worker exposure to lead" since, according to U.S. health

agencies, lead exposure involved risks of "kidney issues, heart disease and reproductive problems

in adults." Indeed, the article noted that "[a] 1978 letter between Communications Workers of

America union officials said that AT&T 'has confirmed that cable splicers may be exposed to a

lead hazard,' and that the company 'is anxious to test splicers that may have been or are exposed

to overdoses of lead.'"

114.   Despite knowing for decades that the lead in its cables was harmful to health and

the environment, AT&T failed to remediate the problem or inform its employees or the public of

the present risk, thereby continuing to risk its employees' health and safety. As a result of the Lead

Cable Misconduct, the Company has been severely damaged, including, *inter alia*, by now being

subject to investigations by the U.S. Justice Department and the EPA.

**False and Misleading Statements**

***March 2020 Environmental, Health and Safety Policy Update***

115.     In March 2020, the Company updated its Environmental, Health and Safety Policy located on its website. The policy applied to the whole Company and stated the following, in relevant part:



**Environment, Health and Safety Policy**                              **AT&T Enterprise-wide**

*AT&T Creed - No job is so important, and no service is so urgent that we cannot take time to perform our work safely and in an environmentally responsible manner*

AT&T is committed to providing a safe working environment and to delivering products and services in a safe, environmentally responsible and sustainable manner. This policy applies to all operations and facilities enterprise-wide.

**AT&T is committed to:**

- Complying with applicable environment, health and safety laws and regulations;
- Measuring environment, health and safety performance and driving continuous improvement;
- Supporting employees in meeting their environment, health and safety obligations by providing necessary and appropriate training, job aids and resources;
- Preventing environment, health and safety incidents at our operations, and responding quickly to protect employees and the public should they occur;
- Using natural resources in a sustainable manner;
- Promoting pollution prevention and recycling, and managing waste responsibly;
- Integrating environment, health and safety considerations into our business processes and encouraging our suppliers, service providers and contractors do the same;
- Managing distribution and logistics activities to minimize risk to employees, the public and the environment;
- Conducting appropriate environment, health and safety due diligence and investigation in connection with mergers and acquisitions;
- Participating with government entities and stakeholders in shaping sound environment, health and safety policies, laws and regulations: and
- Engaging and communicating with relevant stakeholders, including our employees, about opportunities to address environment, health and safety performance.

**Owner**
Corporate Social Responsibility

**Date**
Effective: August 2008
Updated: March 2020

116.    The policy misleadingly stated that the Company is committed to "[s]upporting employees in meeting their environment, health, and safety obligations by providing necessary and appropriate training, job aids and resources," "[p]reventing environment, health and safety incidents at our operations, and responding quickly to protect employees and the public should they occur," "[e]ngaging and communicating with relevant stakeholders, including our employees, about opportunities to address environment, health and safety performance[.]" The foregoing statements were misleading because, at the time of the policy update, AT&T knowingly owned lead covered cables, which created a significant risk of harm to the Company's employees, the public, and the environment.

### *2020 10-K*

117.    On February 25, 2021, AT&T filed its annual report on Form 10-K with the SEC for the year ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants Stankey, Stephens, Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Taylor, and Yang. Attached to the 2020 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Stankey and Stephens attesting to its accuracy.

118.    Regarding employee safety, the 2020 10-K stated the following, in relevant part:

**Employee Safety**

***We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations.*** In response to the COVID-19 pandemic, we consulted with medical professionals to institute policies that best protected our employees and their families. ***We have prioritized self-care and emphasized a focus on wellness,*** providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the necessary remote-work environment. As we look to life and operations beyond the pandemic, we are revising our business models to support flexible office space and at-home productivity for many employees on a permanent basis.

(Emphasis added).

*2021 Proxy Statement*

119.    On March 11, 2021, the Company filed the 2021 Proxy Statement with the SEC. The 2021 Proxy Statement was solicited by Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

120.    The 2021 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang to the Board; (2) the ratification of Ernst & Young LLP as the Company's independent auditors for the 2021 Fiscal Year; and (3) executive compensation, on an advisory basis.

121.    Regarding the Board's Role in Risk Oversight, the 2021 Proxy Statement stated the following, in relevant part:

> The Board is responsible for overseeing our policies and procedures for assessing and managing risk. Management is responsible for assessing and managing our exposures to risk on a day-to-day basis, including the creation of appropriate risk management policies and procedures. Management also is responsible for informing the Board of our most significant risks and our plans for managing those risks. Annually, the Board reviews the Company's strategic business plans, which includes evaluating the competitive, technological, economic and other risks associated with these plans.
>
> In addition, under its charter, the Audit Committee reviews and discusses with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies. This includes, among other matters, evaluating risk in the context of financial policies, counterparty and credit risk, and the appropriate mitigation of risk, including through the use of insurance where appropriate. The Audit Committee also oversees our compliance program and our compliance with legal and regulatory requirements. The internal audit organization provides the Committee with an assessment of the Company's risks and conducts assurance reviews of the Company's internal controls. The finance, compliance and internal audit organizations each provide regular updates to the Audit Committee.

122.    With respect to the Company's Code of Ethics, the 2021 Proxy Statement stated the following:

> The Board has adopted a written Code of Ethics applicable to Directors, officers, and employees that outlines our corporate values and standards of integrity and behavior and is designed to foster a culture of integrity, drive compliance with legal and regulatory requirements and protect and promote the reputation of our Company.

123.    The 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Lead Cable Misconduct; (2) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Ethics. Further, the 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

124.    The 2021 Proxy Statement was also false and misleading because it failed to disclose that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125.    As a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

***2021 10-K***

126.    On February 16, 2022, AT&T filed its annual report on Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"), which was signed by Defendants Stankey, Desroches, Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Taylor, Ubiñas, and Yang. Attached to the 2021 10-K were SOX certifications signed by Defendants Stankey and Desroches attesting to its accuracy.

127.    Regarding employee safety, the 2021 10-K stated the following, in relevant part:

**Employee Safety**

***We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations.*** In response to the COVID-19 pandemic, we consulted with medical professionals to institute policies that best protected our employees and their families, including a policy that requires the vast majority of our employees to be vaccinated. ***We have prioritized self-care and emphasized a focus on wellness,*** providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the necessary remote-work environment. As we look to life and operations beyond the pandemic, we are revising our business models to support flexible office space and at-home productivity for many employees on a permanent basis.

(Emphasis added).

128.    As to environmental issues, the 2021 10-K stated, in relevant part:

Further, customers, consumers, ***investors and other stakeholders are increasingly focusing on environmental issues, including climate change, water use, deforestation, plastic waste, and other sustainability concerns***. Concern over climate change or other environmental, social and governance (ESG) matters ***may result*** in new or increased legal and regulatory requirements to reduce or mitigate

impacts to the environment and reduce the impact of our business on climate change. Further, ***climate change regulations may require us to alter our proposed business plans or increase our operating costs due to increased regulation or environmental considerations, and could adversely affect our business and reputation.***

(Emphasis added).

### *2022 Proxy Statement*

129.    On March 22, 2022, pursuant to Section 14(a) of the Exchange Act, the Company filed the 2022 Proxy Statement with the SEC. The 2022 Proxy Statement was solicited by Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang and contained various materially false and misleading statements and omissions.

130.    The 2022 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang to the Board; (2) the ratification of Ernst & Young LLP as the Company's independent auditors for the 2022 Fiscal Year; and (3) executive compensation, on an advisory basis.

131.    Regarding the Board's Role in Risk Oversight, the 2022 Proxy Statement stated the following, in relevant part:

The Board is responsible for overseeing our policies and procedures for assessing and managing risk. Management is responsible for assessing and managing our exposures to risk on a day-to-day basis, including the creation of appropriate risk management policies and procedures. Management also is responsible for informing the Board of our most significant risks and our plans for managing those risks. Annually, the Board reviews the Company's strategic business plans, which includes evaluating the competitive, technological, economic, environmental and other risks associated with these plans.

In addition, under its charter, the Audit Committee reviews and discusses with management the Company's significant financial, compliance, ethics, and operational risk exposures and the steps management has taken to detect, monitor and control such exposures, including the Company's risk assessment and risk

management policies. This includes, among other matters, evaluating risk in the context of financial policies, counterparty and credit risk, and the appropriate mitigation of risk, including through the use of insurance where appropriate. The Audit Committee also oversees our compliance program and our compliance with legal and regulatory requirements. The internal audit organization provides the Committee with an assessment of the Company's risks and conducts assurance reviews of the Company's internal controls. The finance, compliance and internal audit organizations each provide regular updates to the Audit Committee.

132.    With respect to the Company's Code of Ethics, the 2022 Proxy Statement stated the following:

> The Board has adopted a written Code of Ethics applicable to Directors, officers, and employees that outlines our corporate values and standards of integrity and behavior and is designed to foster a culture of integrity, drive compliance with legal and regulatory requirements and protect and promote the reputation of our Company.

133.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Lead Cable Misconduct; (2) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Ethics. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

134.    The 2022 Proxy Statement was also false and misleading because it failed to disclose that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them

as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

135.    As a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

***2022 10-K***

136.    On February 13, 2023, AT&T filed its annual report on Form 10-K with the SEC for the year ended December 31, 2022 (the "2022 10-K"), which was signed by Defendants Stankey, Desroches, Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Taylor, and Ubiñas. Attached to the 2022 10-K were SOX certifications signed by Defendants Stankey and Desroches attesting to its accuracy.

137.    Regarding environmental risks, the 2022 10-K stated, in relevant part:

> Further, customers, consumers, ***investors and other stakeholders are increasingly focusing on environmental issues, including climate change, water use, deforestation, plastic waste and other sustainability concerns.*** Concern over climate change or other environmental, social and governance ***(ESG) matters may result in new or increased legal and regulatory requirements to reduce or mitigate impacts to the environment and reduce the impact of our business on climate change.*** Further, climate change regulations may require us to alter our proposed business plans or increase our operating costs due to increased regulation or environmental considerations, and could adversely affect our business and reputation.

(Emphasis added).

138.    Regarding employee safety, the 2022 10-K stated, in relevant part:

> **Employee Safety** We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations. ***We have prioritized self-care and emphasized a focus on wellness,*** providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the remote-work environment.

(Emphasis added).

### *2023 Proxy Statement*

139. On April 3, 2023, pursuant to Section 14(a) of the Exchange Act, the Company filed the 2023 Proxy Statement with the SEC. The 2023 Proxy Statement was solicited by Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas and contained various false and misleading statements and omissions.

140. The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the reelection of Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas to the Board; (2) the ratification of Ernst & Young LLP as the Company's independent auditors for the fiscal year ending December 31, 2023; (3) executive compensation, on an advisory basis; and (4) frequency of vote on executive compensation, on an advisory basis.

141. Regarding the Board's Role in Risk Oversight, the 2023 Proxy Statement stated the following, in relevant part:

> The Board is responsible for overseeing our policies and procedures for assessing and managing risk over the short-, medium - and long-term. Management is responsible for assessing and managing our exposures to risk on a day-to-day basis, including the creation of appropriate risk management policies and procedures. Management also is responsible for informing the Board of our most significant risks and our plans for managing those risks, as well as for disclosing our material risks in our periodic reports. Annually, the Board reviews the Company's strategic business plans, which includes evaluating the competitive, technological, economic, environmental and other risks associated with these plans.

> In addition, under its charter, the Audit Committee reviews and discusses with management the Company's significant financial, compliance, ethics, and operational risk exposures and the steps management has taken to detect, monitor and control such exposures, including the Company's risk assessment and risk management policies. This includes, among other matters, evaluating risk in the

context of financial policies, counterparty and credit risk, and the appropriate mitigation of risk, including through the use of insurance where appropriate. The Audit Committee also oversees our compliance program and our compliance with legal and regulatory requirements. The internal audit organization provides the Committee with an assessment of the Company's risks and conducts assurance reviews of the Company's internal controls. The finance, compliance and internal audit organizations each provide regular updates to the Audit Committee.

142.   With respect to the Company's Code of Ethics, the 2023 Proxy Statement stated the following:

The Board has adopted a written Code of Ethics applicable to Directors, officers, and employees that outlines our corporate values and standards of integrity and behavior and is designed to foster a culture of integrity, drive compliance with legal and regulatory requirements and protect and promote the reputation of our Company.

143.   The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Lead Cable Misconduct; (2) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Ethics. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

144.   The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them

as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

145.    As a result of Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *June 8, 2023 Environmental, Health & Safety Compliance Section Update*

146.    On June 8, 2023, AT&T released an update to the Environmental, Health & Safety Compliance Section of its website (the "EHS Compliance Section"). The EHS Compliance Section stated the following, in relevant part:

> ***Being part of a community means taking care of each other and our environment.*** For AT&T, this means we are committed to complying with all applicable environment, health and safety (EHS) laws and regulations pertaining to our operations and the geographies where we work. It also means developing and maintaining the right systems to protect our environment and our employees.
>
> \*\*\*
>
> ***Everyone at AT&T has a role to play in protecting our environment and upholding safety standards.*** From our part-time workers to our CEO, employees are responsible for reviewing the AT&T Code of Business Conduct (COBC) annually and understanding its provisions. ***EHS considerations, such as minimizing and recycling waste, are integrated into our business processes to conserve natural resources and prevent pollution.*** We also encourage our suppliers and contractors to integrate EHS considerations into their processes through our contract language and our requirement to adhere to the AT&T Principles of Conduct for Suppliers. […]

(Emphasis added).

147.    The above-referenced AT&T Code of Business Conduct, which is posted on the Company's website, stated, in relevant part:

**We operate responsibly toward the environment.**

We are committed to operate and to provide products and services in an environmentally responsible and sustainable manner. ***We follow applicable laws and regulations related to the environment. We strive to follow best practices and minimize our environmental impact in ways that are relevant to our business and important to the communities we serve***.

(Emphasis added.)

148.    The statements made in ¶¶ 115-118, 126-128, 136-138, and 146-147 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to shareholders and investors that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

<u>**The Truth Emerges**</u>

149.    On July 9, 2023, the *WSJ* published the July 9 Article, which was entitled "America is Wrapped in Miles of Toxic Lead Cables."  This was the first of several articles by the *WSJ* which exposed its findings from an ongoing investigation, revealing that "***[t]elecom companies laid them***

*(toxic lead cables) decades ago and thousand were left behind, posing a hidden health hazard*

*today[.]*" (Emphasis added.)

150.    Regarding the network of toxic lead cables, the July 9 Article stated the following,

in relevant part:

> *AT&T [...] and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.*
>
> \*\*\*
>
> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.
>
> For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.
>
> \*\*\*
>
> *Doctors say that no amount of contact with lead is safe,* whether ingested or inhaled, *particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.*
>
> \*\*\*
>
> With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.
>
> To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. Removing Army Corps-approved cables at any time would routinely

require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount.

***

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood—more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

*"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood*, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

(Emphasis added.)

151.    Regarding "The Known Risks" and AT&T's knowledge of the lead cables and their

likely environmental and health impacts, the July 9 Article stated, in relevant part:

**THE KNOWN RISKS**

AT&T has previously noted the risks from its cables. "Underground cable presents real possibilities for overexposure" for workers removing them, *AT&T said in a 2010 presentation about employee safety at an industry conference. "Some older metropolitan areas may still have over 50% lead cable," it added.*

*The company considered the potential cost and environmental impact of removing the cables daunting, said Braden Allenby, a former top AT&T environmental health and safety official, now a professor at Arizona State University. "It was standard operating procedure to abandon those cables in place," he said. "We kept the discussion internal and informal. We didn't try to quantify the problem or speak to the economics overall."*

AT&T didn't respond to requests for comment on Allenby's assertions. […]

152.    Regarding the effects that these lead cables had on drinking water, the July 9 Article

stated the following, in relevant part:

*In the Journal's testing at Lake Tahoe, lead was found not just near the cables, but also moving away from the severed Emerald Bay cable toward the beach. On the south side, samples ranged from nearly five times the EPA limit for drinking water to more than eight times, or 132 parts per billion, at a sample taken 20 feet*

*away from the cut end.*

Experts say it is common to find varying results at different times when testing water for lead, depending on numerous factors including movement in the water and temperature.

*A young child swimming for an hour in water and swallowing some of it, with lead content equivalent to that measured by the Journal in May, could add 7.4 micrograms per deciliter of lead to his or her blood*, according to Caravanos, using an EPA lead-exposure model to estimate such risks. To help determine whether medical or environmental follow-up are recommended, the Centers for Disease Control and Prevention uses a level of 3.5 micrograms per deciliter, which is higher than that of 97.5% of young children surveyed nationwide.

(Emphasis added).

153.   The July 9 Article stated the following regarding the finding of lead covered cables

along the Mississippi River, in relevant part:

**MISSISSIPPI BLUES**

On the bank of the Mississippi near New Orleans' Bywater neighborhood, tourists recently walked on a bridge with a cable sticking out below. Lead was flaking off into a spot where homeless people have set up camp. Lead in the sediment there was 19.8 times the EPA guideline for where children could congregate.

Atop a levee in Donaldsonville, La., along the Mississippi, families often stroll near two abandoned cables, one smashed on the ground and the other with a splice box, a large lead casing used to connect cables, sealed with molten lead.

*A reading by Caravanos using the XRF showed lead in the sediment next to the smashed cable and splice box at 2,850 and 2,880 parts per million, respectively— both seven times the EPA guideline for play areas.*

Across the street from the park in a yard strewn with children's toys, an extension of a lead-covered cable and a lead splice box sit in the front of the house of Diane Gros, a 60-year-old mail carrier who has 10 grandchildren. The XRF showed a reading of more than 4,000 parts per million at the site of the cable.

*The New Iberia cable on Bayou Teche was laid in 1940 by Southern Bell, which is now part of AT&T, and has an estimated 500 pounds of buried lead to encase telephone wires, based on an assay of a similar cable. The town uses the area near the cable for a gumbo cook-off and an annual canoe race.*

*A sample of water from the bayou at the cable site showed lead at a level of 7.4 parts per billion.* "Kids come down here and play all the time on the edge of the bayou," said Wilma Subra, an environmental consultant in New Iberia who had been unaware of the cable.

(Emphasis added).

154.   Regarding the confirmation that the cables were the source of the lead, the July 9 Article stated, in relevant part:

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved. *The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.*

*Among those high-lead samples Nelson linked to the cables was one in New Iberia.* Assuming the current levels of lead in the sediment, playing at that spot as a child could have raised the lead in the blood of someone like Tyrin Jones, who has fished for years in that spot, to more than eight times the current CDC threshold, according to the EPA model used by Caravanos.

Another lead-sheathed cable juts out of a swampy pond next to Bayou Teche in Franklin. An analysis of the water sample from the pond showed lead at 471 parts per billion. In a nearby backyard of a home owned by Anthony Peck, his 7-year-old granddaughter, Stella Peck, gathers clover flowers to make into bouquets and necklaces.

AT&T didn't respond to requests for comment on the cables in New Iberia and surrounding areas.

(Emphasis added).

155.   The next day, on July 10, 2023, the *WSJ* published a follow-up article entitled "Bayou Teche is an Epicenter of America's Lead Cable Problem." Originally referenced in the July 9 Article, the Bayou Teche, a waterway in Louisiana, was laced with lead cables originally laid by Southern Bell (part of the Ma Bell network) and now owned by AT&T. The article stated, in relevant part:

Across the country, telecom companies have left behind more than 2,000 cables containing lead, a Wall Street Journal investigation has found, part of a decaying network installed under the old Bell System.

Reporters found cables protruding from banks, resting under bridges, snaking under water and drooping from the air at dozens of sites. Testing showed that many are leaching toxic metal into the ground and water.

Southern Louisiana's 125-mile-long Bayou Teche flows through a region

particularly dense with cables. Southern Bell filed permits with the U.S. Army Corps of Engineers starting in the 1930s to place more than a dozen cables across the bayou.

Journal reporters, with the assistance of environmental researchers, tested the water in nine places along the bayou and the sediment in three of them. Of those 12 tests, eight showed elevated levels of lead. A sediment sample near the cable in New Iberia exceeded the safety recommendation set by the Environmental Protection Agency for areas where children play.

***Southern Bell is now part of AT&T, which didn't respond to requests for comment on the cables in New Iberia and surrounding areas. AT&T said in a written statement it doesn't believe lead-sheathed cables pose a public-health issue. "The health, safety and well-being of our people, our customers, and our communities is of paramount importance," it said. "For decades, we have managed legacy lead-clad cables in compliance with applicable laws and regulations."***

(Emphasis added.)

156.    The July 10 Article stated the following regarding how lead contamination happens, in relevant part:

Here's how the contamination happens:

(1)     Rainwater hits the lead, causing small amounts to dissolve.
(2)     Here, the lead has leached into the ground, where it bonds to organic material in the soil.
(3)     Journal tests linked the lead found in the soil to that in the cable, indicating it likely didn't come from some other source.

Further downstream, in Franklin, another cable sticks up from a small muddy pond next to 7-year-old Stella Peck's backyard. ***The Journal tested a sample of water from the pond and found levels of lead that exceeded the level at which the EPA recommends taking action for drinking water. Although the pond isn't used for drinking water, part of the bayou upstream is.***

Wilma Subra, an environmental consultant who lives in New Iberia, said cables like the one in her town, sticking up from the ground on the bank, are a potential attraction for children.

***They "don't know it's lead," she said. "There is no warning sign."***

(Emphasis added).

157.    On this news, the price per share of AT&T stock fell $0.34, or 2.178%, from closing at a price of $15.61 per share on July 7, 2023, to close at a price of $15.27 per share on July 10, 2023.

158.    Later, on July 12, 2023, the *WSJ* published the July 12 Article, which was also about the lead cables and was entitled "What AT&T and Verizon Knew About Toxic Lead Cables." The July 12 Article stated, in relevant part:

> At a gathering of telecom officials more than a decade ago, John Malone, a senior AT&T manager, cautioned the group about a little-known danger crisscrossing the nation.
>
> *His topic was lead-covered cables, which once carried phone service and had long been obsolete. Weren't these ancient cables gone?*
>
> *"NO," his slide presentation said. "Some older metropolitan areas may still have over 50% lead cable," the slide said. In some places, they posed risks for phone-company workers and the surrounding environment, Malone concluded.*

(Emphasis added).

159.    The July 10 Article continued, regarding the known risk to the health of the Company's employees, and state, in relevant part:

> *For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.*
>
> *They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show*. Environmental records from an AT&T smelting unit in the 1980s show contamination in the soil. Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.
>
> *Over the years, AT&T officials themselves expressed concern about possible worker exposure to lead. Risks include kidney issues, heart disease and reproductive problems in adults, according to U.S. health agencies.*
>
> Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.

*In the 2010 presentation, Malone acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.*

"They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead. Many more are likely to exist.

*Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.*

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks. USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

*** ***

*In a 2013 presentation, Malone described how workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls.*

(Emphasis added.)

160.     The July 10 Article continued by discussing the origin of the lead cables, stating,

in relevant part:

**LEAD ROOTS**

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. *By 1940, the majority of the phone network was in lead-covered cables.*

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

*** 

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

***Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."***

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

161.    The July 12 Article further discussed the history of lead contamination from AT&T

sites, in relevant part:

**SMELTING HEADACHES**

In the mid-1980s, AT&T was recycling large amounts of materials as it updated its systems and retired tons of lead used throughout the network. The company did the

work using its AT&T Nassau Metals division, part of Western Electric.

The smelting unit, which an AT&T executive said at the time received about 50 million pounds of lead-sheathed cable a year in Gaston, S.C., received citations from the state's labor department for safety violations that affected, among others, "150 melt shop employees who are overexposed to lead."

Environmental records show lead contamination in the soil next to the site. An inspection document from 1985 said workers there were exposed to airborne lead nearly 17 times OSHA's safety standard. And a handwritten table by an AT&T official showed that among 90 workers tested that year, the average blood lead level was 33.7 micrograms per deciliter, more than twice average levels back then and nearly 10 times what's considered high today.

Under U.S. Environmental Protection Agency and state scrutiny, AT&T agreed to help clean up the site, including properly containing waste and environmental monitoring.

***

The cleanup has been delayed repeatedly. AT&T's contractor has cited logistical issues including that removal could "disrupt nesting birds (bald eagles, Peregrine falcon, osprey)," according to an email reviewed by the Journal.

Testing in Lake Tahoe by the Journal in March and May of this year showed high levels of lead near the cables. AT&T said the Journal's tests conflict with its own results from March 2021.

162.    On July 14, 2023, the *WSJ* published another article entitled "I was Really Sick, and I Didn't Know From What," which detailed the stories of telecom workers, focusing specifically on former and current AT&T employees, and the dangers they faced at work as a result of their dealings with lead cables. The article stated, in relevant part:

Many telecom employees who worked with lead over the years say they didn't know about the risks. Some have illnesses that can be linked to exposure.

Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkin, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure.

63

There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T [and other telecom giants] left behind a sprawling network of cables, many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.

AT&T dismissed "anecdotal, non-evidence-based linkages to individuals' health symptoms," saying those symptoms "could be associated with a vast number of potential causes." […]

Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. […].

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. AT&T declined to provide anonymized blood-lead testing data about employees and retirees, including from its archives.

A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continued on their jobs," according to letter among union officials. […]

AT&T […] declined to comment on the studies.

163.    The article quoted a current AT&T cable splicer, Cynthia Martinez, who revealed that "[l]ead was taught to me out in the field. There was no formal training, and we felt it was not a danger since everyone worked on it with no mask." The article continued that, "Martinez filed a workers' compensation case against AT&T last year, arguing that her work caused medical troubles including kidney cancer. AT&T denied her claim, citing a lack of supporting medical information, according to a document it sent her."

164.    The article also stated, in relevant part:

> Martinez worked for six year melting lead solder while wearing fingerless gloves and no mask. She later became a cable splicer, working at least once a week with aerial or underground lead-sheathed cables. ***Martinez last year has a kidney removed after resurgence of cancer. Lead is classified as a probable human carcinogen by health agencies.***

(Emphasis added).

165.    The article also depicted the story of Jody Fischer, a former AT&T employee who worked with lead solder, stating, in relevant part:

> Jody Fischer, 69, worked with lead solder for 40 year until retiring in 2020. ***She said she couldn't get pregnant and had anemia, severe anxiety and brain fog, plus kidney-related ailments "all the time." All have been associated with lead exposure.***
>
> ***In AT&T's San Diego central offices, Fischer worked maskless, melting lead solder to connect wire. Workers there said abandoned cables had a dusting of silvery lead so soft people would at time scribble messages in it.***

(Emphasis added).

166.    The article also detailed the story of Dan Fitchhorn, a former AT&T cable splicer. The article stated that "Dan Fitchhorn, 70, described feeling woozy and lightheaded after working long hours with lead in manholes. He often washed his work clothes at home. Regulatory standards require employers to provide for cleaning work clothing that has been exposed to lead. Fitchhorn has had multiple procedures to correct heart-rhythm problems." The article quoted Fitchhorn as saying, "[y]ou think about doing your job and getting a paycheck and taking care of your family. The lead was way, way, way in the back of my mind."

167.    On this news, the price per share of AT&T stock declined by $0.62, or 4.1%, from closing at a price of $15.12 per share on July 13, 2023, to close at a price of $14.50 per share on July 14, 2023.

168.    Next, on July 17, 2023, the website *investing.com* published an article entitled "Telecom stocks' cuts continue on risks tied to toxic lead cables; AT&T at 29-year lows." The

article detailed how analysts had downgraded the Company due to the aforementioned revelations regarding the lead covered cables. The article stated, in relevant part:

> U.S. telecom stocks fell sharply late last week in response to the Wall Street Journal investigation about U.S. phone companies leaving behind a network of cables covered in toxic lead.
>
> Shares in AT&T Inc (NYSE:T) hit a fresh 29-year low on Friday following the WSJ report. The stock closed 7.1% lower last week while Verizon Communications Inc (NYSE:VZ) lost 5.3% to test 12-year lows.
>
> AT&T stock selloff was accelerated on Friday after JPMorgan analysts downgraded to Neutral.
>
> "Potential copper lead sheathing liability is unquantifiable at this time, but will be a substantial long-term overhang on AT&T and the industry," they said.
>
> The in-depth WSJ investigation showed that phone companies have left behind more than 2,000 old lead-encased phone cables. Analysts now worry that the investment needed to clean up this mess is measured in the tens of billions of dollars.
>
> As a result, Citi analysts downgraded AT&T stock to Neutral, with a "High Risk" designation. […].
>
> "After the past week of discussions and research, we have concluded the industry's historical use of lead sheathed cabling is likely to remain an overhang for the stocks and valuation for at least a few months and potentially longer until the market can better measure the financial risk (if anything material) for each firm," analysts said in a client note.
>
> Similarly, Goldman Sachs analysts say the telecom stocks are now facing a new "fundamental" risk related to lead-sheathed telecom cables.
>
> The stock market reaction is understandable given that the market likely wasn't aware of the issues, say analysts.
>
> "The primary potential fundamental risk that this issue raises, in our view, is that it may take the major wireline telcos longer, and cost them more, to decommission legacy networks based on copper cables that may have lead sheathing. Further, it may be necessary to divert capital from their fiber upgrades towards legacy network decommissioning, which could delay the timeline for completing these projects," analysts wrote in a note.

169.     Also on July 17, 2023, the *WSJ* published an article entitled "Environmental Groups

Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in relevant part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> *A Wall Street Journal investigation revealed that AT&T [and other telecom companies] have left behind more than 2,000 toxic lead cables on poles, under waterways and in soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.*
>
> "Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.
>
> The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation.
>
> The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.
>
> *The Journal found lead leaching into soil directly underneath aerial lead cables, according to the test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.*
>
> "If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure soil contaminated by the aerial cables is removed or permanently covered."
>
> Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed  for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, [and USTelecom], an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

***Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.***

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

***"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.***

***Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."***

(Emphasis added).

170.     The same day, the *WSJ* published another article entitled "Telecom Stocks Extend

Losses After WSJ Toxic Lead Investigation." The article stated, in relevant part:

> Shares of AT&T [and other telecommunications companies] extended their losses
> on Monday as analysts responded to an investigation by The Wall Street Journal
> that revealed U.S. phone companies have left behind a network of cables covered
> in toxic lead.
>
> ***
>
> Monday's declines extend losses in the sector from last week. AT&T [and other
> telecom companies] shed a combined $18 billion in market cap since the WSJ's
> story were first published, and that was before Monday's declines,
> MoffettNathanson analysts Craig Moffett and Nick Del Deo said earlier Monday.
>
> "We could see what amounts to a general telecom buyer's strike for some
> time," the analysts said. [. . .]

(Emphasis added).

171.     On this news, the price per share of AT&T stock fell by $0.97, or 6.689%, from a

closing price of $14.50 per share on July 14, 2023, to close at a price of $13.53 per share on July

17, 2023.

172.     The truth fully emerged on July 26, 2023 when the *WSJ* published another article

entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article

stated, in relevant part:

> The Justice Department and Environmental Protection Agency are investigating the
> potential health and environmental risks stemming from a sprawling network of
> toxic lead-sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the
> Southern District of New York, is in preliminary stages and focuses partly on
> whether telecom companies had knowledge of the potential risks to their workers
> and future environmental impact when they left behind the lead cables, according
> to a person familiar with the inquiry.
>
> The EPA's enforcement office, using the agency's authority under the "Superfund"
> law, on Wednesday directed [AT&T] to provide inspections, investigations and
> environmental sampling data, including future testing plans, about their lead cables
> and related lead infrastructure within 10 days. Under the EPA's Superfund law,

known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

A Wall Street Journal investigation recently revealed that AT&T [. . .] and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.

"We are collaborating with the EPA and will provide any information requested, including our recent testing in Lake Tahoe and Michigan," an AT&T spokeswoman said.

*** 

In a letter to AT&T reviewed by the Journal, the agency specifically asked for information relating to, among other things, AT&T's lead-sheathed cables in Bayou Teche, La., cited in the Journal investigation. The EPA said such data is "needed to evaluate the nature and extent of releases or threatened releases of lead from telecommunications cables, splice boxes, and associated equipment, whether abandoned or in use."

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

The Journal also has reported that AT&T has previously noted the potential risks from its lead cables in industry safety presentations in 2010 and 2013. Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T [. . .] and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

70

In an earnings call Wednesday, AT&T Chief Executive John Stankey said the company is "working cooperatively with the Environmental Protection Agency to provide them the information needed to conduct a thorough assessment of the issue using the most up-to-date reliable science."

AT&T has said the 2010 and 2013 presentations were about worker safety and aren't "an acknowledgement that lead-clad cables pose a general public health issue. As reflected in these presentations, we follow best practices to maintain this legacy infrastructure in a way that's safe for all based on established science."

After the Journal's articles, AT&T disclosed last week that lead-clad cables represent less than 10% of its copper footprint of roughly two million sheathed miles. Analysts have estimated that to be about 200,000 miles of lead cable. AT&T has expanded blood lead testing offered to workers after the Journal's articles.

***

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

(Emphasis added).

173.   On this news, the price per share of AT&T stock fell $0.38, or 2.55%, from a

closing price of $14.89 per share on July 26, 2023, to close at a price of $14.51 per share on July

27, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

174.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $3.4 billion to repurchase approximately 124,254,060 shares of its own common stock.

175.    According to the quarterly report on Form 10-Q the Company filed with the SEC on May 6, 2020 for the period ended March 31, 2020 (the "1Q20 10-Q"), between March 1, 2020 and March 31, 2020, the Company purchased 59,221,415 shares of its own common stock at an average price per share of approximately $35.32, for a total cost to the Company of approximately $2,091,700,378.

176.    As the Company's stock was actually worth only $14.24 per share[2], the price at closing on July 27, 2023, the Company overpaid by approximately $1.2 billion for repurchases of its own stock between March 1, 2020 and March 30, 2020.

177.    According to the quarterly report on Form 10-Q the Company filed with the SEC on August 5, 2020 for the period ended June 30, 2020 (the "2Q20 10-Q"), between April 1, 2020 and April 30, 2020, the Company purchased 48,894 shares of its own common stock at an average price per share of approximately $33.41, for a total cost to the Company of approximately $1,633,549.

178.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $937,298 for repurchases of its own stock between April 1, 2020 and April 30, 2020.

---

[2] On July 27, 2023, the Company's common stock had a closing price of $14.51 per share and an adjusted closing price of $14.24 per share. These repurchase calculations use the $14.24 per share figure.

179.    According to the 2Q20 10-Q, between May 1, 2020 and May 31, 2020, the Company purchased 145,630 shares of its own common stock at an average price per share of approximately $33.33, for a total cost to the Company of approximately $4,853,848.

180.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $2,780,077 for repurchases of its own stock between May 1, 2020 and May 31, 2020.

181.    According to the 2Q20 10-Q, between June 1, 2020 and June 30, 2020, the Company purchased $937,490 shares of its own common stock at an average price per share of approximately $29.85, for a total cost to the Company of approximately $27,984,077.

182.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $14,634,219 for repurchases of its own stock between June 1, 2020 and June 30, 2020.

183.    According to the quarterly report on Form 10-Q the Company filed with the SEC on November 5, 2020 for the period ended September 30, 2020 (the "3Q20 10-Q"), between July 1, 2020 and July 31, 2020, the Company purchased 47,279 shares of its own common stock at an average price per share of $29.99, for a total cost to the Company of approximately $1,417,897.

184.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $744,644 for repurchases of its own stock between July 1, 2020 and July 31, 2020.

185.    According to the 3Q20 10-Q, between August 1, 2020 and August 31, 2020, the Company purchased 24,431 shares of its own common stock at an average price per share of approximately $29.90, for a total cost to the Company of approximately $730,487.

186.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $382,590 for repurchases of its own stock between August 1, 2020 and August 31, 2020.

187.    According to the 3Q20 10-Q, between September 1, 2020 and September 30, 2020, the Company purchased 581,107 shares of its own common stock at an average price per share of approximately $28.42, for a total cost to the Company of approximately $16,515,061.

188.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $8.2 million for repurchases of its own stock between September 1, 2020 and September 30, 2020.

189.    According to the 2020 10-K, between October 1, 2020 and October 31, 2020, the Company purchased 294,518 shares of its own common stock at an average price per share of approximately $28.52, for a total cost of approximately $8.3 million.

190.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $4.2 million for repurchases of its own stock between October 1, 2020, and October 31, 2020.

191.    According to the 2020 10-K, between November 1, 2020, and November 30, 2020, the Company purchased 78,988 shares of its own common stock at an average price per share of approximately $28.69, for a total cost to the Company of approximately $2.2 million.

192.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $1.1 million for repurchases of its own stock between November 1, 2020 and November 30, 2020.

193.    According to the 2020 10-K, between December 1, 2020 and December 31, 2020, the Company purchased 702,940 shares of its own common stock at an average price per share of approximately $28.58, for a total cost to the Company of approximately $20 million.

194.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $10 million for repurchases of its own stock between December 1, 2020 and December 31, 2020.

195.    According to the quarterly report on Form 10-Q the Company filed with the SEC on May 6, 2021 for the period ended March 31, 2021 (the "1Q21 10-Q"), between January 1, 2021 and January 31, 2021, the Company purchased 246,890 shares of its own common stock at an average price per share of approximately $29.62, for a total cost to the Company of approximately $7.3 million.

196.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $3.7 million for repurchases of its own stock between January 1, 2021 and January 31, 2021.

197.    According to the 1Q21 10-Q, between February 1, 2021 and February 28, 2021, the Company purchased 3,540,401 shares of its own common stock at an average price per share of approximately $29.09, for a total cost to the Company of approximately $102.9 million.

198.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $52.5 million for repurchases of its own stock between February 1, 2021 and February 28, 2021.

199.    According to the 1Q21 10-Q, between March 1, 2021 and March 31, 2021, the Company purchased 2,219,810 shares of its own common stock at an average price per share of $29.60, for a total cost to the Company of approximately $65.7 million.

200.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $34 million for repurchases of its own stock between March 1, 2021 and March 31, 2021.

201.    According to the quarterly report on Form 10-Q the Company filed with the SEC on August 5, 2021 (the "2Q21 10-Q"), between April 1, 2021 and April 30, 2021, the Company purchased 40,460 shares of its own common stock at an average price per share of $29.92, for a total cost to the Company of approximately $1.2 million.

202.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $634,412 for repurchases of its own stock between April 1, 2021 and April 30, 2021.

203.    According to the 2Q21 10-Q, between May 1, 2021 and May 31, 2021, the Company purchased 36,612 shares of its own common stock at an average price per share of $30.36, for a total cost to the Company of approximately $1.1 million.

204.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $590,185 for repurchases of its own stock between May 1, 2021 and May 31, 2021.

205.    According to the 2Q21 10-Q, between June 1, 2021 and June 30, 2021, the Company purchased 1,253,318 shares of its own common stock at an average price per share of $28.82, for a total cost to the Company of approximately $36.1 million.

206.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $18.2 million for repurchases of its own stock between June 1, 2021 and June 30, 2021.

207.     According to the quarterly report on Form 10-Q the Company filed with the SEC on November 4, 2021 (the "3Q21 10-Q"), between July 1, 2021 and July 31, 2021, the Company purchased 100,782 shares of its own common stock at an average price per share of $29.10, for a total cost to the Company of approximately $2.9 million.

208.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $1.4 million for repurchases of its own stock between July 1, 2021 and July 31, 2021.

209.     According to the 3Q21, between August 1, 2021 and August 31, 2021, the Company purchased 99,720 shares of its own common stock at an average price of $28.09 per share, for a total cost to the Company of approximately $2.8 million.

210.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $1.3 million for repurchases of its own stock between August 1, 2021 and August 31, 2021.

211.     According to the 3Q21, between September 1, 2021 and September 30, 2021, the Company purchased 200,899 shares of its own common stock at an average price of $27.28 per share, for a total cost to the Company of approximately $5.4 million.

212.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $2.6 million for repurchases of its own stock between September 1, 2021 and September 30, 2021.

213.     According to the 2021 10-K, between October 1, 2021 and October 31, 2021, the Company purchased 265,408 shares of its own common stock at an average price of $27.14 per share, for a total cost to the Company of approximately $7.2 million.

214.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $3.4 million for repurchases of its own stock between October 1, 2021 and October 31, 2021.

215.     According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 56,662 shares of its own common stock at an average price of $24.96 per share, for a total cost to the Company of approximately $1.4 million.

216.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $607,416 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

217.     According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 120,417 shares of its own common stock at an average price of $22.96 per share, for a total cost to the Company of approximately $2.7 million.

218.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $1.05 million for repurchases of its own stock between December 1, 2021 and December 31, 2021.

219.     According to the quarterly report on Form 10-Q the Company filed with the SEC on May 3, 2022 for the period ended March 31, 2022 (the "1Q22 10-Q"), between January 1, 2022 and January 31, 2022, the Company purchased 441,806 shares of its own common stock at an average price per share of $25.24, for a total cost to the Company of approximately $11.1 million.

220.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $4.8 million for repurchases of its own stock between January 1, 2022 and January 31, 2022.

221.   According to the 1Q22 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 5,333,062 shares of its own common stock at an average price per share of $24.25, for a total cost to the Company of approximately $129.3 million.

222.   As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $53.3 million for repurchases of its own stock between February 1, 2022 and February 28, 2022.

223.   According to the 1Q22, between March 1, 2022 and March 31, 2022, the Company purchased 2,446,867 shares of its own common stock at an average price per share of $23.26, for a total cost to the Company of approximately $56.9 million.

224.   As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $22 million for repurchases of its own stock between March 1, 2022 and March 31, 2022.

225.   According to the quarterly report on Form 10-Q the Company filed with the SEC on August 4, 2022 for the period ending on June 30, 2022 (the "2Q22 10-Q"), between April 1, 2022 and April 30, 2022, the Company purchased 9,093,020 shares of its own common stock at an average price per share of $19.32, for a total cost to the Company of approximately $175.6 million.

226.   As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $46 million for repurchases of its own stock between April 1, 2022 and April 30, 2022.

227.   According to the 2Q22 10-Q, between May 1, 2022 and May 31, 2022, the Company purchased 25,667,231 shares of its own common stock at an average price per share of $19.39, for a total cost to the Company of approximately $497.6 million.

228.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $132 million for repurchases of its own stock between May 1, 2022 and May 31, 2022.

229.    According to the 2Q22 10-Q, between June 1, 2022 and June 30, 2022, the Company purchased 72,250 shares of its own common stock at an average price per share of $21.06, for a total cost to the Company of approximately $1.5 million.

230.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $492,745 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

231.    According to the quarterly report on Form 10-Q the Company filed with the SEC on November 3, 2022 for the period ended September 30, 2022 (the "3Q22 10-Q"), between July 1, 2022 and July 31, 2022, the Company purchased 10,601 shares of its own common stock at an average price per share of approximately $19.61, for a total cost to the Company of approximately $207,885.

232.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $56,927 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

233.    According to the 3Q22 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 42,245 shares of its own common stock at an average price per share of approximately $18.69, for a total cost to the Company of approximately $789,559.

234.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $187,990 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

235.     According to the 3Q22 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 88,447 shares of its own common stock at an average price per share of approximately $17.46, for a total cost of the Company of approximately $1.5 million.

236.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $284,799 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

237.     According to the 2022 10-K, between October 1, 2022 and October 31, 2022, the Company purchased 400,261 shares of its own common stock at an average price per share of $15.23, for a total cost to the Company of approximately $6 million.

238.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $396,258 for repurchases of its own stock between October 1, 2022 and October 31, 2022.

239.     According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company purchased 344,935 shares of its own common stock at an average price per share of $18.41, for a total cost to the Company of approximately $6.3 million.

240.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $1.4 million for repurchases of its own stock between November 1, 2022 and November 30, 2022.

241.     According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company purchased 146,267 shares of its own common stock at an average price per share of approximately $19.16, for a total cost to the Company of approximately $2.8 million.

242.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $719,633 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

243.    According to the quarterly report on Form 10-Q the Company filed with the SEC on May 1, 2023 for the period ended March 31, 2023 (the "1Q23 10-Q"), between January 1, 2023 and January 31, 2023, the Company purchased 900,166 shares of its own common stock at an average price per share of $19.49, for a total cost to the Company of approximately $17.5 million.

244.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $4.7 million for repurchases of its own stock between January 1, 2023 and January 31, 2023.

245.    According to the 1Q23 10-Q, between February 1, 2023 and February 28, 2023, the company repurchased 5,522,937 shares of its own common stock at an average price per share of $19.55, for a total cost to the Company of $107.9 million.

246.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $29.3 million for repurchases of its own stock between February 1, 2023 and February 28, 2023.

247.    According to the 1Q23 10-Q, between March 1, 2023 and March 31, 2023, the Company purchased 3,397,304 shares of its own common stock at an average price per share of approximately $18.33, for a total cost to the Company of approximately $62.2 million.

248.    As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $13.8 million for repurchases of its own stock between March 1, 2023 and March 31, 2023.

249.     According to the quarterly report on Form 10-Q the Company filed with the SEC on July 27, 2023 for the period ended June 30, 2023 (the "2Q23 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 37,968 shares of its own common stock at an average price per share of $19.60, for a total cost to the Company of approximately $747,589.

250.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $206,925 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

251.     According to the 2Q23 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 17,519 shares of its own common stock at an average price per share of $17.19, for a total cost to the Company of approximately $301,151.

252.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $51,681 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

253.     According to the 2Q23 10-Q, between June 1, 2023 and June 30, 2023, the Company purchased 27,103 shares of its own common stock at an average price per share of $15.68, for a total cost to the Company of approximately $424,975.

254.     As the Company's stock was actually worth only $14.24 per share, the price at closing on July 27, 2023, the Company overpaid by approximately $39,028 for repurchases of its own stock between June 1, 2023 and June 30, 2023.

255.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $1.7 billion.

## DAMAGES TO AT&T

256.     As a direct and proximate result of the Individual Defendants' conduct, AT&T will lose and expend many millions of dollars.

257.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

258.     Such losses include the Company's overpayment of over $1.7 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

259.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Lead Cable Misconduct.

260.     Such expenditures also include, but are not limited to, fees, costs, and any payments associated with the U.S. Department of Justice's and EPA's investigations and/or civil inquiries into the Company arising from the Lead Cable Misconduct and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

261.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the Lead Cable Misconduct and any other misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

262.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

263.     As a direct and proximate result of the Individual Defendants' conduct, AT&T has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

264.     Plaintiff brings this action derivatively and for the benefit of AT&T to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AT&T, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act and the aiding and abetting thereof.

265.     AT&T is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

266.     Plaintiff is, and has been at all relevant times, a shareholder of AT&T. Plaintiff will adequately and fairly represent the interests of AT&T in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

267.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

268.     A pre-suit demand on the Board of AT&T is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas (the

"Director Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director Defendants that were on the Board at the time of the filing of this complaint.

269.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Lead Cable Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $1.7 billion for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

270.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to engage the Lead Cable Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

271.    Additional reasons that demand on Defendant Stankey is futile follow. Defendant Stankey has served as the Company's CEO and as a member of the Board since 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Stankey with his principal occupation for which he receives handsome compensation. As CEO, Defendant Stankey is ultimately responsible for the Company's engagement in the Lead Cable Misconduct

and all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he signed in the 2020, 2021, and 2022 10-Ks—for which he also signed SOX certifications. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. This is even more alarming considering his extensive background in the telecommunications industry and his "37 years of [] leadership spanning nearly every area of AT&T's business."[3] Moreover, Defendant Stankey solicited the false and misleading 2021, 2022, and 2023 Proxy Statements, which resulted in, *inter alia*, his re-election to the Board. Further, Defendant Stankey is a defendant in the Securities Class Action. For these reasons, Defendant Stankey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

272.    Additional reasons that demand on Defendant Ford is futile follow. Defendant Ford has served as a Company director since 2012. He also serves as Chairperson of the Corporate Development and Finance Committee and as a member of the Executive Committee and the Human Resources Committee. Defendant Ford has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Defendant Ford also solicited the false and

---

[3] https://investors.att.com/corporate-governance/board-of-directors

misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Ford signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

273.    Additional reasons that demand on Defendant Hutchins is futile follow. Defendant Hutchins has served as a Company director since 2014. He also serves as Chairperson of the Governance and Policy Committee and as a member of the Corporate Development and Finance Committee and the Executive Committee. Defendant Hutchins has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Hutchins also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Hutchins signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Hutchins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

274.    Additional reasons that demand on Defendant Kennard is futile follow. Defendant Kennard has served as a Company director since 2014. Defendant Kennard also serves as the Independent Chairman of the Board. He also serves as Chairperson of the Executive Committee

and as a member of the Governance and Policy Committee. Defendant Kennard has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Kennard also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Kennard signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Kennard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

275.    Additional reasons that demand on Defendant Luczo is futile follow. Defendant Luczo has served as a Company director since 2019. He also serves as a member of the Audit Committee and the Corporate Development and Finance Committee. Defendant Luczo has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Luczo also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Luczo signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K.

For these reasons, Defendant Luczo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and therefore, excused.

276.    Additional reasons that demand on Defendant McCallister is futile follow. Defendant McCallister has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Human Resources Committee. Defendant McCallister has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant McAllister also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant McCallister signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant McCallister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.    Additional reasons that demand on Defendant Mooney is futile follow. Defendant Mooney has served as a Company director since 2013. She also serves as Chairperson of the Human Resources Committee and as a member of the Governance and Policy Committee and the Executive Committee. Defendant Mooney has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and

to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Mooney also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, her re-election to the Board. Furthermore, Defendant Mooney signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Mooney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

278.   Additional reasons that demand on Defendant Rose is futile follow. Defendant Rose has served as a Company director since 2010. He also serves as a member of the Corporate Development and Finance Committee and the Human Resources Committee. Defendant Rose has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Rose also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Rose signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Rose breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279.    Additional reasons that demand on Defendant Taylor is futile follow. Defendant Taylor has served as a Company director since 2013. She also serves as Chairperson of the Audit Committee and as a member of the Executive Committee. Defendant Taylor has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. Defendant Taylor also solicited the false and misleading 2021, 2022, and 2023 Proxy Statements which resulted in, *inter alia*, her re-election to the Board. Furthermore, Defendant Taylor signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K. For these reasons, Defendant Taylor breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

280.    Additional reasons that demand on Defendant Ubiñas is futile follow. Defendant Ubiñas has served as a Company director since 2021. He also serves as a member of the Audit Committee and the Governance and Policy Committee. Defendant Ubiñas has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Ubiñas also solicited the false and misleading 2022 and 2023 Proxy Statements which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Ubiñas signed, and thus personally made, the false and

misleading statements and omissions in the 2021 10-K and 2022 10-K. For these reasons, Defendant Ubiñas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

281.    Additional reasons that demand on the Board is futile follow.

282.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $1.7 billion for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

283.    Defendants Luczo, McCallister, Taylor, and Ubiñas served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Luczo, McAllister, Taylor, and Ubiñas failed to adequately review and discuss the Company's Forms 10-K; failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the Lead Cable Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Luczo, McCallister, Taylor, and Ubiñas further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

284.    In violation of the Code of Ethics, the Director Defendants engaged in or permitted the schemes to cause the Company to engage in the Lead Cable Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of

control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; prevent the Company from participating in the Lead Cable Misconduct; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

285.    AT&T has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for AT&T any part of the damages AT&T suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

286.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

287.    The acts complained of herein constitute violations of fiduciary duties owed by AT&T's officers and directors, and these acts are incapable of ratification.

288.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AT&T. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of AT&T, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

289.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause AT&T to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

290.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

291.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

292.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

293.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

294.    Under the direction and watch of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang, the 2021 Proxy Statement failed to disclose: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational

harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

295.    Under the direction and watch of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang, the 2022 Proxy Statement failed to disclose: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

296.    Under the direction and watch of Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas, the 2023 Proxy Statement failed to disclose: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially

significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

297.     Moreover, the 2021, 2022, and 2023 Proxy Statements failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Lead Cable Misconduct; (2) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Code of Ethics. Further, the 2021, 2022, and 2023 Proxy Statements were materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

298.     Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the re-election of directors.

299.     Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were

98

material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

300.     Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

301.     As a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

302.     As a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

303.     As a result of Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

304.     The Company was damaged as a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang's material

misrepresentations and omissions in the 2021 Proxy Statement.

305.   The Company was damaged as a result of Defendants Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, Ubiñas, and Yang's material misrepresentations and omissions in the 2022 Proxy Statement.

306.   The Company was damaged as a result of Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas's material misrepresentations and omissions in the 2023 Proxy Statement.

307.   Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

308.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

309.   The Individual Defendants, by virtue of their positions with AT&T and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AT&T and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause AT&T to engage in the illegal conduct and practices complained of herein.

310.   Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

311.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

312.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding AT&T. Not only is AT&T now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon AT&T by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 100 million of its own shares at artificially-inflated prices, damaging AT&T.

313.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

314.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AT&T not misleading.

315.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control

and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by AT&T.

316.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

317.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

318.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

<u>**FOURTH CLAIM**</u>

**Against the Individual Defendants for Breach of Fiduciary Duties**

319.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

320.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AT&T's business and affairs.

321.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

322.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AT&T.

323.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Lead Cable Misconduct.

324.    In breach of their fiduciary duties owed to AT&T, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) as part of its telecommunications network, the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces potentially significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them as a possible threat to employee and community safety; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

325.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

326.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

327.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

328.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Lead Cable Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Lead Cable Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Lead Cable Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AT&T's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

329.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

330.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AT&T has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

331.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

332.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

333.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AT&T.

334.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from AT&T that was tied to the performance or artificially inflated valuation of AT&T or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

335.    Plaintiff, as a shareholder and a representative of AT&T, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

336.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

337.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

338.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AT&T, for which they are legally responsible.

339.    As a direct and proximate result of the Individual Defendants' abuse of control, AT&T has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AT&T has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

340.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AT&T in a manner consistent with the operations of a publicly held corporation.

343.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AT&T has sustained and will continue to sustain significant damages.

344.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

345.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

346.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

347.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

348.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AT&T to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries by the Department of Justice and the EPA, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

349.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

350.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

351.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Stephenson, Stankey, Desroches, and Stephens for Contribution Under Sections 10(b) and 21D of the Exchange Act**

352.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

353.    AT&T and Defendants Stephenson, Stankey, Desroches, and Stephens are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Stephenson's, Stankey's, Desroches's, and Stephens's willful and/or reckless violations of their obligations as officers and/or directors of AT&T.

354.    Defendants Stephenson, Stankey, Desroches, and Stephens, because of their positions of control and authority as officers and/or directors of AT&T, were able to and did,

directly and/or indirectly, exercise control over the business and corporate affairs of AT&T, including the wrongful acts complained of herein and in the Securities Class Action.

355.    Accordingly, Defendants Stephenson, Stankey, Desroches, and Stephens are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

356.    As such, AT&T is entitled to receive all appropriate contribution or indemnification from Defendants Stephenson, Stankey, Desroches, and Stephens.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AT&T, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AT&T;

(c)    Determining and awarding to AT&T the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AT&T and the Individual Defendants to take all necessary actions to reform and improve AT&T's corporate governance and internal procedures to comply with applicable laws and to protect AT&T and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of AT&T to nominate at least five candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding AT&T restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2024                      Respectfully submitted,

OF COUNSEL:                                   FARNAN LLP

THE BROWN LAW FIRM, P.C.                      /s/ Michael J. Farnan
Timothy Brown                                 Brian E. Farnan (Bar No. 4089)
767 Third Avenue, Suite 2501                  Michael J. Farnan (Bar No. 5165)
New York, NY 10017                            919 N. Market St., 12th Floor
Telephone: (516) 922-5427                     Wilmington, DE 19801
Facsimile: (516) 344-6204                     Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net             Facsimile: (302) 777-0301
                                              Email: bfarnan@farnanlaw.com
                                              mfarnan@farnanlaw.com

                                              *Attorneys for Plaintiff*